STATE, EX REL., F. M. WOOLRIDGE ET AL., APPELLEES, V. JOHN H. MOREHEAD ET AL., APPELLANTS.

FILED FEBRUARY 21, 1917. No. 19764.

1. **Banks and Banking:** BANK CHARTER: POWER OF BANKING BOARD. A statute regulating banks and banking does not justify the refusal by the banking board of a bank charter where the proposed stockholders have paid in the banking capital of the proposed new bank, and possess the qualifications required by the statute, and have in all respects complied with the law.

2. ———: ———: ———. The state banking board cannot adopt rules concerning the granting of charters to proposed new banks, which are in contravention of the statute, and, if it does, such rules are void.

3. **Statutes:** CONSTRUCTION. The statute conferring authority upon an officer or board under the police power of the state should be strictly construed, and all powers not specifically granted or necessarily implied are reserved.

4. **Banks and Banking:** BANKING BOARD: DUTIES. Where privileges are granted by a board created by statute, such privileges should be open to the enjoyment of all upon the same terms and conditions.

APPEAL from the district court for Lancaster county: ALBERT J. CORNISH, JUDGE. *Affirmed.*

*Willis E. Reed, Attorney General,* and *Charles S. Roe,* for appellants.

*Morning & Ledwith, contra.*

HAMER, J.

Appeal from a judgment of the district court for Lancaster county. The relators allege an incorporation for the purpose of conducting the Nebraska State Bank at Sidney, Nebraska. They demanded of the state banking board a charter authorizing said corporation to conduct a commercial banking business at Sidney, Cheyenne county, Nebraska, and tendered the payment of the fee of $25. They also offered to furnish the necessary proof to satisfy said board that the incorporators were all persons of integrity and financial responsibility. The said banking board heard the application of the relators and then, on the 12th day of June, 1916, refused to grant the charter demanded. The banking board concluded that the conditions and existing business in the city of Sidney, and territory adjacent thereto, would not justify the issuance of such charter and the establishment of said bank at said point, and, for that reason alone, refused to issue said charter. It is alleged that said banking board is without legal authority to limit the number of banks in any given locality, and that, in rejecting the application of relators and in refusing to grant said charter, said board exceeded its legal authority, and assumed to exercise a power which it does not possess under the statute. The prayer is that a writ of mandamus issue commanding the said respondents, and the state banking board, forthwith to convene as such board, and to approve said articles of incorporation, and to grant and issue to said Nebraska State Bank a charter authorizing it to transact a commercial banking business at Sidney, Cheyenne county, Nebraska. An alternative writ was issued, and to this the respondents returned that it was proposed to establish a commercial state bank at the city of Sidney; that the city of Sidney has a population of from between 1,500 and 1,600, and that it is supplied with three substantial banks which provide ample and satisfactory banking facilities for the people of Sidney and

100 Neb.—55

vicinity, and that there is no demand or desire on the part of the people of Sidney for an additional fourth bank; that a fourth bank in the city of Sidney will oversupply said city to the detriment of the banking business there located, and will jeopardize the guaranty fund of the state and the public welfare. The respondents in their answer denied that the banking business legitimately done at the city of Sidney was large enough to accommodate an additional bank without injuring the interests of stockholders or directors in existing banks or in such additional bank. A trial was had in the district court of Lancaster county, and a peremptory writ of mandamus was issued commanding the respondents, as the state banking board of the state of Nebraska, "forthwith to approve the application of the relators, and to grant a charter to them authorizing them to establish the Nebraska State Bank at Sidney, Nebraska, as prayed in the petition." The district court also made a finding for the relators: "That the respondents refused to grant a charter to the relators applying therefor for the reason that in the opinion of the board there were already sufficient banking facilities in the town of Sidney, Nebraska, and that the establishment of another bank in that community was unnecessary and would be detrimental to the public interests, and to the banking interests of the state in particular, and would endanger the bank guaranty fund of the state; that said charter applied for by the relators (to the state banking board) was denied for no other reason." The district court also found: "That under the laws of this state the banking board is without power to deny a charter to persons applying therefor for such reason alone; that the banking business is a lawful business and in no way deterimental to the interests of the state; that under the law as it now exists, when persons apply for a charter giving them the privilege of doing a banking business, and are in every way qualified to do the banking business, and have complied with all conditions

and requirements of the law to enter into the banking business in a particular community, the board is without power to deny them the privilege of entering into the banking business and give such banking business in a community exclusively to others, thereby creating a monopoly of banking business in that community."

The following was received from the banking board: "Your favor of the 24th instant, addressed to Hon. John H. Morehead, has been referred to this department, and in reply will say that the banking board rejected the application for the proposed fourth bank at Sidney after carefully considering the same and being fully satisfied that there was no call or need for additional banking facilities at that place, and that it was for the best interests of the depositors and the people of the community generally to disapprove the application and to withhold the issuance of a charter for the proposed bank; too many banks being a detriment." It appears that the board rejected the application on the ground that there was no demand for an additional bank; that is, that an additional bank at Sidney would not be justified.

Section 295, Rev. St. 1913, is apparently directed at the power attempted to be conferred upon the board: "Whenever, after the examination and approval by the state banking board of the statement provided for in the next preceding section, the corporation shall file with the state banking board the oath of the president, or cashier, that the capital stock has been paid in as provided for, and in compliance with section 13 of this chapter, then the state banking board, if, upon investigation, it shall be satisfied that the parties requesting said charters are parties of integrity and responsibility, shall, upon the payment of certain fees as hereinafter provided, issue to said corporation the certificate provided for in section 14 and a charter to transact the business provided for in its articles of incorporation."

This section would seem to be mandatory. If the corporation files with the state banking board the oath of the president or cashier that the capital stock has been paid in, as provided for, and in compliance with section 13 of the chapter, then the banking board shall investigate, and if the parties are parties of integrity and responsibility, and they pay the fees, then the board shall "issue to said corporation the certificate provided for in section 14 and a charter to transact the business provided for in its articles of incorporation." If the legislature had intended to confer upon the banking board the jurisdiction to determine how many banks there should be in any locality, or whether there should not be any, it would have said so. To say that there is some sort of hidden intent in the language used, which does not appear there, would be, upon our part, an invasion of the power which is conferred upon the legislature.

It is claimed that the questions involved in this case were determined in *State v. Morehead,* 99 Neb. 146. An examination of that case shows that the question before the banking board was whether a charter should issue to a bank wherein "the relators intended to conduct the business of a state savings bank in the same room, or in a room immediately adjacent to the room, occupied by the First National Bank of Clarks, and that the officers and directors of the two banks would be the same persons, or practically so." It was not a very wide question that was before the board. The board declined to issue the charter apparently on the ground that the business of the two banks would, under the circumstances, be interlaced, and the fact that they were conducted in such close proximity, and by the same persons, or substantially so, would necessarily lead to confusion. In the opinion it is said: "The act fixed a maximum rate of interest; two or more banks transacting business in the same city are forbidden to use the same name, or names so nearly alike as to cause confusion in transacting business, and, in case such condition did exist at the

time the act became effective, the board is empowered to require such change or modification as will prevent the confusion."

It is further said: "Again, it may be said that when two banks are conducted in the same room, and managed by the same people, depositors may easily be mistaken as to which bank has their account. They may believe that it is deposited under the provisions of this act, while in reality their account is carried in the other bank. Again, it may complicate examinations. National banks' are not subject to examination by the state examiners. State banks are not under the control of the federal goverment, nor subject to examination by its examiners. Experience has shown that, where the banking business is conducted as proposed by the relators, it is easy to transfer funds from one bank to another. If one of the banks finds itself in straightened circumstances, the temptation is great to draw on the other bank to tide it over an examination. Indeed, it is stipulated in the record that, in the year 1913, where a national bank and a state savings bank were conducted under conditions such as are proposed, the failure of the national bank caused the failure of the state bank with a loss to the guaranty fund in the sum of $54,000." Further discussing the danger of running two banks in such proximity, and by the same persons, the opinion states: "If the guaranty fund does not directly guarantee the deposits in the national bank, yet the fact that in the same room, or in the room adjacent, the same parties are operating a state bank under the guaranty fund may lead the general public to believe that the money deposited in the national bank is also guaranteed."

In adopting that opinion the only thing this court had before it was whether the proposed new bank should start up when its stockholders were stockholders and officers in the national bank, and where there was danger that the guaranty fund would suffer because of the drafts which indirectly, or even directly, might be made upon

it through the stockholders and officers of the national bank. This court said, in substance, that it was for the board to determine whether it would be unsafe to trust the management of a state bank to the officers and stockholders of the national bank, and in a room so close to the national bank that the officers of one bank might readily be mistaken for the officers of the other bank, or the same men might be officers in both banks. This court sustained the banking board when it determined as a matter of safety that the proposed new bank could not start out when its welfare was likely to be attacked by the stockholders and officers of the old bank. That is not this case. This court did not there decide that a charter for a state bank could not be issued in that town, or that it could not be issued to other and different stockholders, incorporators and officers. The banking board was afraid to take the risk of tempting the stockholders and officers of the state bank when possibly their interests were at stake in the other bank. It also considered that there was danger that depositors would mistake one bank for the other. In substance, it said to the applicants for the charter: "You cannot start out with your proposed new bank when there is a possible millstone hanging about its neck in the shape of the old bank." This was the judgment of business men of experience. They knew the danger of what they were talking about.

It is also said in the opinion: "By the Nebraska banking act, article I, ch. 6, Rev. St. 1913, banking is declared to be a quasi-public business, subject to regulation and control by the state, and it is made unlawful to engage in this business, except by means of a corporation duly organized for that purpose." Also: "The act creates a banking board, giving it general supervision and control of all banks coming within its provisions. It is made the duty of the governor to appoint a secretary for the board, and examiners, who are empowered 'to make a thorough examination into all the banks, papers and

affairs of any corporation transacting a banking business in this state.' "

The examiners are empowered to summon witnesses, and also to administer oaths, and to make detailed reports to the banking board, and if the bank is found to be insolvent or conducting its business in an unsafe or unauthorized manner, or is endangering the interests of the depositors, then the examiner may retain possession of the money and property of every description belonging to the bank until the banking board can act upon his report. There is no doubt that the act provides for shutting up a bank and taking care of the interests of the depositors. But that is a very different matter from determining whether one or more banks shall be allowed in a neighborhood. There is no misunderstanding what the legislature has said about regulating the bank and shutting it up for the protection of the stockholders. But that is a very different thing from determining whether a new bank shall be authorized to commence business.

It is strenuously argued that the guaranty fund is to be protected. That is undoubtedly right, but there is no provision that the banking board shall refuse to issue a charter to the proposed new bank simply because members of the board think that there are enough banks in the town or village. When the legislature concludes, if it does, that it will confer the power to limit the number of banks upon the banking board, it may then have the right to do so, but at present there is no act which seems to confer this power.

In the last sentence contained in section 295, Rev. St. 1913, it is said: "On payment of the required fees and the receipt of the charter the proposed bank may begin to transact a banking business." It would seem that, on compliance with the requirements of section 294 in making the preliminary statement and the examination of such statement by the board, and the filing of the oath of the president or cashier that the stock has been paid in, and it shall be further found that the parties seeking

the charter are parties of integrity and responsibility, then the charter shall be issued. And there is nothing after that except the payment of the fees before the bank may begin business.

We are not called upon to determine whether the legislature has the power to confer upon the banking board the authority to limit the number of banks in any particular locality. It will be time enough to pass upon that question when it is reached.

The powers of the board not granted by the statute are withheld. *Morrill v. Jones,* 106 U. S. 466; *Scribner State Bank v. Ransom,* 35 S. Dak. 244; *State v. Cook,* 174 Mo. 100.

Police regulations with no other guide than the uncontrolled discretion of a board are discriminatory, and when so applied that all persons may not engage in legitimate callings upon equal terms, are void. *Iler v. Ross,* 64 Neb. 710; *Yick Wo v. Hopkins,* 118 U. S. 356. A statute passed in the exercise of the police power of the state should be strictly construed. *People v. Sommer,* 106 N. Y. Supp. 190; *People v. Marx,* 99 N. Y. 377.

The judgment of the district court is

AFFIRMED.

CORNISH, J., not sitting.

ROSE, J., dissenting.

Relators complied with the statutory provisions in regard to the incorporation of banks, and applied to the state banking board for a charter to conduct a commercial bank at Sidney, where there are already three substantial banks with facilities sufficient for the accommodation of the entire community. A charter was refused, and to coerce the board into issuing one the district court for Lancaster county, upon motion of relators, granted a peremptory writ of mandamus. Respondents appealed. In reviewing the judgment of the trial court a majority of my associates hold that the board was without power to deny the application of relators. I

dissent. The board in declining to issue a charter to relators acted under a grant of power from the legislature. The majority opinion to the contrary is a departure from the doctrine of a recent decision by a unanimous court. Rev. St. 1913, secs. 284, 339; *State v. Morehead,* 99 Neb. 146.

The question is: Had the board discretionary power to refuse a charter? The act relating to this subject creates a board with power to regulate banks and banking, makes provision for a guaranty fund for the protection of state bank depositors generally, and, among other things declares: "Said board shall have general supervision and control of banks and banking under the laws of this state and no person or persons shall be permitted to engage in or transact a banking business save corporations having complied with the provisions of this article." Rev. St. 1913, sec. 284.

"The state banking board shall prescribe all such forms as may be useful or necessary in carrying out the provisions of this article, and shall have power to make such rules and regulations, not inconsistent with the provisions of this article, as may be necessary or proper to carry it into effect according to its true intent." Rev. St. 1913, sec. 339.

These statutory provisions grant the power exercised by the board in refusing a charter, since the action taken was not unreasonable nor arbitrary. The board's control extends to both "banks" and "banking." The power to limit the number of competitive banks in a community is included in the power to control banks and banking. In *State v. Morehead,* 99 Neb. 146, it was held that the banking act should be liberally construed, that "the intention of the legislature was to vest the banking board with general control and with authority to do all things reasonably necessary for the protection of depositors throughout the state," and that the banking board had discretion to refuse a charter though the applicants had complied with the provisions of the

statute. The doctrine of that case is in harmony with new conditions and modern thought. A lawyer and statesman recently said:

"There is one special field of law development which has manifestly become inevitable. We are entering upon the creation of a body of administrative law quite different in its machinery, its remedies, and its necessary safeguards from the old methods of regulation by specific statutes enforced by the courts. As any community passes from simple to complex conditions the only way in which government can deal with the increased burdens thrown upon it is by the delegation of power to be exercised in detail by subordinate agents, subject to the control of general directions prescribed by superior authority. The necessities of our situation have already led to an extensive employment of that method. The interstate commerce commission, the state public service commissions, the federal trade commission, the powers of the federal reserve board, the health departments of the states, and many other supervisory offices and agencies are familiar illustrations. Before these agencies the old doctrine prohibiting the delegation of legislative power has virtually retired from the field and given up the fight." 2 American Bar Ass'n Journal, 749.

Under the new banking act each state bank is assessed to create funds to protect the depositors in state banks generally. The guaranty feature of the law introduced a new element into the business of banking. Additional safeguards became imperative. Power to limit the number of banking institutions in a community has been granted to administrative boards in other states. In discussing this subject a writer on economics said:

"The guaranty of deposits is so powerful an inducement to depositors, legislators believe, that for fear of its misuse by the incompetent or unscrupulous the banking departments are empowered not only to regulate and supervise banks, but to say what rates of interest they shall pay, and whether the citizens shall establish more

banks. In some states both these powers are exercised."
28 Quarterly Journal of Economics, 111.

The supreme court of Kansas, in upholding the power
to limit the number of banks spoke as follows:

"An unnecessary bank in a community is not a thing
of passive uselessness only, and so merely of no benefit.
It is an active disturber of the financial peace, to the
detriment of the public welfare; and it is not very ma-
terial whether we say that public harm will be prevented
or that public good will be promoted by its suppression."
*Schaake v. Dolley,* 85 Kan. 598, 609.

The safety of banking institutions, the prevention of
failures, and the protection of depositors are subjects of
public interest and may be affected by an excess in the
number of banks. The failure of an unnecessary bank
may destroy all other banks in the vicinity. The old
process of elimination through bank failures often re-
sulted in riot and bloodshed. It produced maniacs and
paupers. In addition, its fruits were suspicion, distrust
and litigation. In conferring upon the state banking
board power to supervise and control banks and banking,
the legislature meant that a proper limitation on the
number of banks should precede, and thus prevent, dis-
aster. To that end the lawmakers authorized the state
banking board to lay its restraining hand on applicants
for charters, where a new and unnecessary bank may
become a menace to the banking business. All of these
subjects are fairly within the legislative grant of "general
supervision and control of banks and banking." In re-
fusing to issue a charter the board acted under a rule
which was "necessary" or "proper" for the purpose of
carrying the act "into effect according to its true intent."
Rev. St. 1913, sec. 339.

The general purposes of the act should be considered
in determining the meaning of the statutory terms used by
the lawmakers, including the enactment that the board
"shall" issue a charter, if satisfied upon investigation that
the applicants are persons of integrity and responsibility

and that they have complied with the statutory requirements in regard to the incorporation of state banks. Rev. St. 1913, sec. 295. When the general powers of the board are considered with the obvious purposes of the act, the word "shall" is consistent with discretionary power of the board to reject a charter. *State v. Taylor,* 208 Mo. 442; *State v. Strait,* 94 Minn. 384; *In re O'Hara,* 82 N. Y. Supp. 293.

Believing that the board acted within its powers, and that there is nothing in the record to show that its decision was unreasonable or arbitrary, I dissent from the affirmance of the judgment allowing the writ, and from the opinion of the majority.

MORRISSEY, C. J., concurs in this dissent.