IN RE STERILIZATION OF GLORIA CAVITT.
STATE OF NEBRASKA, APPELLANT AND CROSS-APPELLEE, V.
GLORIA CAVITT ET AL., APPELLEES AND CROSS-APPELLANTS.

157 N. W. 2d 171

Filed March 8, 1968.   No. 36648.

Clarence A. H. Meyer, Attorney General, and Melvin K. Kammerlohr, for appellant.

Vincent L. Dowding and Luebs, Tracy & Huebner, for appellees.

Heard before WHITE, C. J., CARTER, SPENCER, BOSLAUGH, SMITH, McCOWN, and NEWTON, JJ.

CARTER, J.

This is an appeal by the State of Nebraska from a judgment of the district court for Gage County reversing an order of the Board of Examiners of Mental Deficient directing the sterilization of Gloria Cavitt.

The county court of Dawson County, after a hearing, committed Gloria to the Beatrice State Home on October 1, 1962, and she was admitted to the home on October 10, 1962, where she has remained to the time of trial in the district court, so far as the record shows. On August 23, 1966, the superintendent filed his petition with the board praying for a hearing before the board to determine whether Gloria should be sterilized as a condition prerequisite to her release from the home as provided by Chapter 83, article 5, R. R. S. 1943, as amended. Notice of the hearing was given, a hearing held, and the order of the board entered that Gloria should not be paroled or discharged from the home unless sterilized. No contention is made that statutory procedures were not followed. Gloria was represented by Vincent L. Dowding, her guardian and a member of the bar. An appeal was taken to the district court for Gage County which determined that the evidence was insufficient to sustain the order of the board and that the controlling statutes authorizing Gloria's sterilization were unconstitutional and void. The State thereupon appealed to this court.

The primary question before this court is the consti-

tutionality of sections 83-501 to 83-508, R. R. S. 1943, particularly section 83-504, R. R. S. 1943, which states: "It shall be the duty of the board of examiners to make a psychiatric and physical examination of these patients and, if after a careful examination, such board of examiners finds that such patient is mentally deficient, in the opinion of the board of examiners, is apparently capable of bearing or begetting offspring and, based on their psychiatric and medical findings as a result of this examination, it is the opinion of the board of examiners that such patient should be sterilized, as a condition prerequisite to the parole or discharge, then such patient shall not be paroled or discharged, as the case may be, unless said patient be made sterile, and that such operation be performed for the prevention of procreation as in the judgment of the board of examiners would be most appropriate to each individual case."

It will be noted that the findings of the board of examiners necessary to make an order for the sexual sterilization of a mentally defective patient are: (1) That the patient is mentally deficient, (2) that the patient is apparently capable of bearing or begetting offspring, and (3) that in its opinion such patient should be sterilized as a condition to parole or discharge. It is the contention of Gloria that the power to sexually sterilize a mentally deficient patient exists only when it is determined that the mental deficiency is such that it will be inherited by offspring. The statute does not require any such finding by the board nor does the evidence support any such finding. Under such circumstances it is asserted that the applicable statute does not contain adequate standards for the guidance of the board of examiners and by its terms permits arbitrary action by such board in such degree as to render the act unconstitutional as an unlawful delegation of legislative power.

It is generally the law that the police power of the state is broad enough to permit the sexual sterilization of mentally deficient inmates of the Beatrice State Home

where such mental deficiency is hereditary and would probably be inherited by children born to such inmate. In re Clayton, 120 Neb. 680, 234 N. W. 630; Buck v. Bell, 274 U. S. 200, 47 S. Ct. 584, 71 L. Ed. 1000.

The Clayton case was decided by this court in 1931 under the sterilization law then in effect, which provided in part: "* * * if after a careful examination and investigation, such board of examiners find that such inmate is feeble-minded or insane * * *, that such inmate is capable of bearing or begetting offspring, that children born or begotten by such inmate would inherit a tendency to feeble-mindedness, insanity, or degeneracy * * *, that such children would probably become a social menace and that procreation by such inmate would be harmful to society and that such inmate should not be paroled or discharged, as the case may be, unless sterilized, * * *." Laws 1929, c. 163, § 4, p. 565. In 1957, the foregoing statute was repealed and the present law heretofore quoted was enacted in its stead. It is plain that the holdings in the Clayton case do not control the disposition of the present controversy.

It can hardly be disputed that the right of a woman to bear and the right of a man to beget children is a natural and constitutional right, nor can it be successfully disputed that no citizen has any rights that are superior to the common welfare. Acting for the public good, the state, in the exercise of its police power, may impose reasonable restrictions upon the natural and constitutional rights of its citizens. Measured by its injurious effect upon society, the state may limit a class of citizens in its right to bear or beget children with an inherited tendency to mental deficiency, including feeble-mindedness, idiocy, or imbecility. It is the function of the Legislature, and its duty as well, to enact appropriate legislation to protect the public and preserve the race from the known effects of the procreation of mentally deficient children by the mentally deficient. But in the delegation of this legislative power to an administra-

tive board, the question immediately arises, from the constitutional viewpoint, as to whether or not adequate standards and guidelines have been provided the administrative board to insure that the purpose of the statute disclosed by the act will be carried out.

In the present act, only two standards have been provided, first, that the patient is mentally deficient, and, second, that the patient is apparently capable of bearing offspring. After these findings have been made, the determination as to whether or not the patient will be sterilized is left entirely to the professional judgment of the board. It is a fundamental rule that the constitutionality of a legislative act is determined, not from what has been done under it, but from what may be done under it. It is apparent here that the board could order the sterilization of a patient who had suffered mental deficiency from an accident or disease, or some form of mental deficiency entirely unrelated to the transmission to offspring of a tendency to mental deficiency.

Gloria was 35 years of age at the time of trial in the district court and had been a patient in the Beatrice State Home since October 10, 1962. That she is mentally deficient is not disputed. The cause of her mental deficiency is not known. Before entering the home she had lived with one William Cavitt for some 14 years in what she called a common law relationship. After breaking up her relationship with Cavitt, she had much difficulty in caring for her eight children resulting from this association and after her commitment they were cared for by her parents. She came from a low social and economic group. Both she and the children were provided for largely by public aid. Four of the doctors on the board who heard the petition of the superintendent of the home to determine if she should be sterilized as a condition precedent to her release from the home testified at the hearing in district court. None of these doctors had investigated the mental condition of her parents or of her children.

The testimony of the two psychiatrists, the psychologist, and the general medical practitioner, all members of the board, can be summarized as follows: Gloria has an I.Q. of 71 and is in the lower two or three percent of the population in intelligence. All agreed that she was mentally deficient and probably capable of bearing children. After a review of Gloria's record and the observation of her, plus the I.Q. test, it was determined that she lacked the mental stability to handle social adjustment problems. Her attitude and personal feelings were considered. Consideration was given to the probable effect upon her of having more children, her minimal capacity to handle the responsibilities of parenthood, the possibility of producing mentally defective children, and the probability that added responsibilities of parenthood would in all likelihood handicap her potential rehabilitation.

The legislative authorization for the sterilization of mental defectives is a proper exercise of the police power, if constitutional requirements are met. In re Clayton, *supra;* Smith v. Command, 231 Mich. 409, 204 N. W. 140, 40 A. L. R. 515; Buck v. Bell, *supra.* The sterilization of a mentally defective female by salpingectomy is not a cruel and unusual punishment and in no sense is it a punishment for crime. In re Clayton, *supra;* State v. Troutman, 50 Idaho 673, 299 P. 668. The fact that the sterilization statute is limited to mental defectives in the Beatrice State Home, the only state institution of its kind in the state, does not deny the equal protection of the law as class legislation. Buck v. Bell, *supra.* But the contention is here made that in Buck v. Bell, *supra,* persons in state institutions properly constitute a class for the purposes of this type of legislation, while in the instant case, the legislation is applicable only to one named state institution and the door is not left open for future institutions to enter the same class.

The history of the legislation and the consideration of statutes in pari materia become material in the resolu-

tion of the problem. The method and basis of admission of mentally deficient persons to the Beatrice State Home are uniform throughout the state. It is provided that the Nebraska institution for feeble-minded youth shall be known as the Beatrice State Home. § 83-217, R. R. S. 1943. It is also provided by section 83-218, R. R. S. 1943, that the Beatrice State Home shall provide custodial care and humane treatment for those persons who are feeble-minded. Feeble-minded persons are defined by section 83-219, R. R. S. 1943, as: "* * * any person afflicted with mental defectiveness from birth or from early age, so pronounced that he is incapable of managing himself and his affairs and of subsisting by his own efforts, or of being taught to do so, or that he requires supervision, control and care for his own welfare, or for the welfare of others, or for the welfare of the community, and who cannot be classified as an insane person." The Beatrice State Home is the only institution to which such mentally defective persons may be committed under section 83-220, R. R. S. 1943, et seq. It is plain under the comprehensive plan adopted by the Legislature that but one such institution shall exist in this state and that the sterilization statutes are to apply only to the inmates of such institution. If the comprehensive plan of the Legislature be changed by the establishment of a second institution for the care of the mentally deficient, it would be necessary to change the classification of the institutions to which the sterilization statutes apply in order to avoid a denial of the equal protection of the law as class legislation. But the Legislature need not anticipate such a change that rests only within its power to bring about. We think the sterilization statutes are not unconstitutional as class legislation or as denying equal protection of the law under the peculiar facts and circumstances of this case.

It is contended that the words "mentally deficient" when applied to persons is so vague and indefinite as to make the sterilization statutes unconstitutional. The

terms mentally deficient and mentally retarded are generally considered as synonymous terms having a generally accepted meaning. A statutory definition can be drawn from section 83-219, R. R. S. 1943, which meets all constitutional requirements. It is further contended that the sterilization statutes are void in that quasi-judicial powers have been unlawfully delegated to the board of examiners of mental deficient. There is no basis for this contention under our holding in Hadden v. Aitken, 156 Neb. 215, 55 N. W. 2d 620, 35 A. L. R. 2d 1003. See, also, In re Main, 162 Okl. 65, 19 P. 2d 153.

It is contended here that the standards and guidelines under which the professional board of physicians is to act do not meet constitutional requirements. Two findings are essential before the board may act, a finding of mental deficiency of the patient and that in its opinion the patient is capable of bearing children. The statute then provides that if, in its opinion, on its psychiatric and medical findings, such patient should be sterilized as a condition for release, the board has authority to make such an order. But it is here contended that the statute is deficient in not requiring a finding that any children born to the patient would inherit a tendency to mental deficiency. Many of the earlier cases on the subject seem to have adopted that theory. But the advances in medical science have dispelled the theory that all mental defectives produce mental defectives and all normal persons do not. Such is not the case for unexplainable reasons which has brought about a change of thinking in the medical profession.

It is now the settled law that the Legislature, in the exercise of the police power, may make reasonable regulations consonant with the public welfare in dealing with mentally defective people. Heredity is not always the cause of mental deficiency. Environment is a factor that must be considered. It is an established fact that mental deficiency accelerates sexual impulses and any tendencies toward crime to a harmful degree. Many

states have sterilization laws which have been upheld that are applied to certain types of crimes such as rape and incest. They have been applied to habitual criminals. They have been applied to mental defectives where transmission of mental weakness to offspring is not possible. The effect of mental deficiency upon the patient, children born to him, the community, and the general welfare, as well as the conditions leading to his commitment, are pertinent considerations in the area of sterilization. The question is a legislative one which is valid if constitutional due process is afforded and the rights of the patient protected. We point out that the sterilization statute before us is compulsory only when required before release from the Beatrice State Home. It is not compulsory in the sense that the patient is to be sterilized under all circumstances, since it is applicable only as a prerequisite to discharge or parole from the home. Remaining in the home makes the statute inapplicable. The fundamental issue is the reasonableness of the statute as an exercise of the police power. We think it reasonable.

In upholding a similar act, the Supreme Court of Kansas said: "The legislature provided a tribunal eminently competent to deal with the peculiar interests involved, and the procedure is adapted to the nature of the subject. * * * The judicial tribunals are open to the inmate to test the validity of the law and the thirty-day period gives him reasonable time in which to institute proceedings to that end." State ex rel. Smith v. Schaffer, 126 Kan. 607, 270 P. 604. See, also, State v. Noll, 171 Neb. 831, 108 N. W. 2d 108; State v. Madary, 178 Neb. 383, 133 N. W. 2d 583.

Sterilization is a much misunderstood subject when applied to the mentally deficient. The public has a natural revulsion of feeling against sterilization of mental defectives even when it is clear that the public welfare requires it. Mental deficiency with its alarming results presents a social and economic problem of grave im-

portance which gives rise to the exercise of the police power by the Legislature. The Beatrice State Home is full to overflowing with these unfortunates as is evidenced by the fact that Gloria was compelled to wait 10 days after commitment before being admitted to the home because of a lack of room. Thus far we have been endeavoring to demonstrate that the statute under consideration, measured by the purpose for which it was enacted and the conditions which warranted it, and justified by the findings of experts in biological science, is a proper and reasonable exercise of the police power. The opposition to such a statute as we have before us is largely based on the assumption that the operation is inhuman, unreasonable, and oppressive. The surgical operation of vasectomy on mentally defective males and salpingectomy on mentally defective females is a simple operation without pain or discomfort to the patient. It does not reduce his sex impulses nor limit his capacity to engage in sexual relations. It does no harm to the patient other than to eliminate his capacity to procreate.

We limit our holding to the facts of this case and the statute we have before us. We have here a case where the patient has not been cured, but who is eligible for release from the home if she is sterilized. She can remain in the home without being sterilized. Sterilization is only a condition for parole or discharge. It is compulsory only if she insists upon her release. We fail to see how the statute is in any manner unconstitutional on any grounds under these precise circumstances. It constitutes a reasonable invocation of the police power for the public welfare. We therefore hold sections 83-501 to 83-508, R. R. S. 1943, are constitutional. The evidence in this case is sufficient to sustain the findings of the board of examiners of mental deficient under the act if it be constitutional as we have found it to be.

The guardian of Gloria Cavitt has filed a cross-appeal in her behalf, asserting that the trial court erred in failing to appoint a guardian ad litem for her to carry

on this litigation. The State contends that section 83-505, R. R. S. 1943, allows a fee of $25 to the guardian for the hearing before the board of examiners of mental deficient and that no other legal fees or expenses are provided for or allowable. We agree that the $25 allowance is for the appearance before the board at the hearing provided for in section 83-505, R. R. S. 1943.

The record shows that Gloria through her guardian applied to the district court for the appointment of a guardian ad litem which was denied. The record shows, however, that her guardian, a lawyer, represented her in the district court and in this court. She was ably represented and the failure of the trial court to appoint a guardian ad litem was without prejudice to the rights of Gloria, since the guardian carried out the functions of a guardian ad litem. The trial court denied the guardian's claim for the allowance of a guardian ad litem fee for legal services.

It is provided by section 7-113, R. R. S. 1943, that an attorney appointed as a guardian ad litem for an incompetent person shall be entitled to such compensation as the court shall deem reasonable. We think the trial court should have allowed a reasonable attorney's fee to the guardian for services rendered while acting in the capacity of guardian ad litem to be taxed as other costs. We can find no authority, and none has been cited, which authorizes the legal fees to be taxed against the State except as a part of the costs. The fact that Gloria appears to have no property out of which the fees of the de facto guardian ad litem can be paid in a noncriminal proceeding does not furnish any reason for imposing the liability on the State. We allow the guardian $500 legal fees for services rendered in this court to be taxed as costs. We remand this portion of the cause to the district court for the fixing of the guardian ad litem's fee in that court.

The judgment of the district court holding sections 83-504 and 83-505, R. R. S. 1943, unconstitutional is re-

versed. The cause is remanded for the purpose of the fixing of legal fees for services rendered by the guardian in the district court. The costs are taxed to the appellee, Gloria Cavitt.

REVERSED AND REMANDED.

SMITH, J., dissenting.

The critical issue is whether the sterilization law denies substantive due process of law guaranteed by the Constitution of Nebraska. I too believe that the right of man to procreate is not absolute, that a balance must be struck between the private right and the police power. Two considerations are the statutory interpretation made by the court and the strength of reliable scientific opinion about involuntary sterilization.

The law applies, according to the court, to voluntary sterilization alone—an interpretation with which I do not concur. The court supplies, however, little guidance to anyone in solving problems of effective consent by the mentally retarded and of substitute consent. More important, the coercive feature is hardly masked by the fictive option of sterilization or life imprisonment.

The factual approach to constitutionality begins with the record. The board members concluded that heredity, environment, or both produce mental retardation, and their conclusion is obviously undeniable. Some also found a probability that future offspring of Gloria would be mentally retarded, but nothing in the record shows the competence of anyone to make that judgment.

Outside the record, but within the ambit of judicial notice, a 1963 report on the mentally retarded in the Beatrice State Home reads: "The Director * * * made an extensive survey of all people admitted for the years 1940 through 1960 to determine changes as to age and level of retardation at time of admission * * *. Briefly, the findings (which are in line with the trends in the United States) are: people are coming to the Beatrice State Home at an increasingly earlier age; they are more retarded; and they are evenly distributed in pro-

portion to population, with no apparent variation because of race, geography, or families' social classes or level of intelligence. * * * more staff and services are needed * * * to study the cause of their mental retardation in order to be able to prevent damage to children yet unborn." First Biennial Report, Department of Public Institutions of Nebraska, pp. 81-82.

The State itself cites an article that reads: "* * * Dr. Leo Kanner has written, 'In my 20 years of psychiatric work with thousands of children and their parents, I have seen percentually at least as many "intelligent" adults unfit to rear their offspring as I have seen such "feeble-minded" adults. I have—and many others have—come to the conclusion that, to a large extent independent of the I.Q., fitness for parenthood is determined by emotional involvements and relationships.' Kanner, A Miniature Textbook of Feeble-Mindedness, p. 5." Bligh "Sterilization and Mental Retardation," 51 A. B. A. J., 1059.

The preceding quotations correspond with expert opinions cited by Elyce Ferster in 1966: "Concerning the claim of eugenicists that the efforts of society to help the unfit works against the welfare of the race the Committee (of the American Neurological Association) said: 'It is precisely in those communities where social care is good that we find the evidence of the finest culture and, on the whole, the best biology. It is in those communities where social care is poor that the population presents an appalling spectacle of degradation.' * * *

"A recent opinion * * * (was) expressed by the Mental Health Committee of the South Dakota Medical Association * * *: 'Medical science has by no means established that heredity is a factor in the development of mental disease with the possible exception of a very few and rare disorders. The Committee holds that the decision to sterilize for whatever reason, should be left up to the free decision reached by patient and family

physician mutually and that the State has no good reason to trespass in this area.'

"The scientific arguments against sterilization were ably summarized in 1960 by Dr. Bernard L. Diamond when he served as a special consultant to the American Psychiatric Association for its report on mental health legislation in British Columbia: '* * * In short, the present state in our scientific knowledge, does not justify the widespread use of the sterilization procedures in mentally ill or mentally deficient persons. . . . It is sometimes proposed that sterilization is demanded, irrespective of the uncertainties of our knowledge of heredity, in that a mentally ill or feebleminded person is incapable of providing the emotional and material environment required to raise a normal child. Perhaps this is so, but it raises issues of a sociological and political nature of a very uncertain character and it may be most dangerous to apply such sociological concepts under the guise of a genetic thesis that is far from proven and highly uncertain in its application.'" Ferster, "Eliminating the Unfit—Is Sterilization the Answer?," 27 Ohio St. L. J., 591, 603-604.

Reviewing genetic aspects of intelligent behavior, Irving G. Gottesman warned: "The issues involved in eugenics are only partly based on a knowledge of genetics, the others being social, axiological, moral, economic, and political. * * * the preservation and improvement of these genetic attributes of man that have resulted in his favored evolutionary position are important but * * * premature attempts to apply our fragmentary knowledge in any dogmatic fashion would be extremely complex." Ellis (Ed.), Handbook of Mental Deficiency, p. 291.

Neither the court nor the board specifies the elements of environment to mediate a significant judgment concerning sterilization. Lack of knowledge is inferable. Environmental deprivation was appraised in a 1964 comment on terms proposed to differentiate remediable from irremediable mental retardation:

"A central problem * * * is the lack of reliable, valid, and precise measurement techniques; for a differential diagnosis * * *, the problem of adequate measurement is crucial. For example, if the term mental retardation denotes remediable cases in which environmental or emotional factors are the primary causes of lowered functioning, the precise measurement of such factors would be sine qua non of accurate diagnosis. However, current measures of emotional disturbance and environmental deprivation are, at best, gross and relatively unreliable. * * * For a large proportion of the mentally retarded, particularly those functioning at a higher intellectual level, knowledge of etiology and prognosis hardly seems sufficient at the present time to warrant a clear-cut differentiation between remediable and irremediable." Davitz, Davitz & Lorge, Terminology and Concepts in Mental Retardation, p. 11.

In determining the reasonableness of the sterilization law, we consider private deprivation, societal benefits, and possibilities of the state realizing those benefits at a lower cost. Appraisal of goals and remedies is difficult at best and impossible without identification of the environmental elements. I cannot imagine a causality vaguer than that of heredity, environment, or both; and that very vagueness warns of menacing power over bodily integrity. Judicial review is an empty safeguard when legislative, administrative, and judicial standards of protection are as deficient as those in this case. The sterilization law denies substantive due process of law guaranteed by the Constitution of Nebraska.

McCOWN, J., joins in this dissent.

NEWTON, J., dissenting.

The judgment of the district court must be reversed as a result of the provision in Article V, section 2, of the Constitution of the State of Nebraska which is as follows: "No legislative act shall be held unconstitutional except by the concurrence of five judges." The

act in question is composed of sections 83-501 to 83-508, R. R. S. 1943.

The opinion of Carter, J. correctly points out that under our present statutes the only findings required by the board of examiners are: "(1) That the patient is mentally deficient, (2) that the patient is apparently capable of bearing or begetting offspring, and (3) that *in its opinion* such patient should be sterilized as a condition to parole or discharge." (Emphasis supplied.) The former Nebraska statute which was held to be constitutional in In re Clayton, 120 Neb. 680, 234 N. W. 630, required one additional finding, namely that any children born or begotten by such feeble-minded person would inherit a tendency to feeble-mindedness, insanity, or degeneracy, that such children would probably become a social menace, and that such procreation would be harmful to society. Both the present and the former acts constitute an exercise of the police power. In the case of Golden v. Bartholomew, 140 Neb. 65, 299 N. W. 356, this court stated: " 'The legislature cannot, under the guise of police regulation, arbitrarily invade private property or personal rights. The test when such regulations are called in question is whether they have some relation to the public health or public welfare, and whether such is, in fact, the end sought to be attained.' " The court also said: " 'In order that a statute may be sustained as an exercise of the police power, the courts must be able to see that the enactment has for its object the prevention of some offense or manifest evil or the preservation of the public health, safety, morals or general welfare; that there is some clear, real and substantial connection between the assumed purpose of the enactment and the actual provisions thereof; and that the latter do in some plain, appreciable and appropriate manner tend toward the accomplishment of the object for which the power is exercised. * * * Measures adopted by the legislature to protect the public health and secure the public safety and welfare must have some relation to

those proposed ends. If it is apparent that the statute, under the guise of a police regulation, does not tend to preserve the public health, safety or welfare, it is unconstitutional, * * *.'" See, also, Lincoln Dairy Co. v. Finigan, 170 Neb. 777, 104 N. W. 2d 227. Under the former Nebraska act, it is obvious that the Legislature felt that feeble-mindedness was an inheritable condition which could be transmitted from generation to generation and that procreation by feeble-minded persons was detrimental to the public welfare. This provision has been deleted from our present statute and the statute fails to make clear in what manner, if any, the Legislature now considers procreation by a feeble-minded person to be detrimental to society and it clearly does not require the finding of any facts whatsoever that point in that direction. It may be noted that in the great majority of cases, and perhaps without exception, where other jurisdictions have held sterilization statutes to be constitutional, the thinking of the Legislature on the question of public welfare was incorporated in the statute in the same manner as it may be found in the old Nebraska act now repealed. I know of no instance where a statute such as the present Nebraska statute has been upheld.

As a general rule: "Purely legislative power, which can never be delegated, has been described as the authority to make a complete law—complete as to the time when it shall take effect *and as to whom it shall be applicable*—and to determine the expediency of its enactment." (Emphasis supplied.) 16 Am. Jur. 2d, Constitutional Law, § 242, p. 493. "The legislature may not delegate to administrative agencies the determination of what the law shall be, *to whom it may be applied,* or what acts are necessary to effectuate the law." (Emphasis supplied.) 1 Am. Jur. 2d, Administrative Law, § 104, p. 902. "The exercise of undefined general power legislative in character must be denied to administrative officers whether that power is to be exercised in the making of general rules or the making of case-by-

case determinations, and the legislature may offend against the Constitution when it confers unlimited discretion upon administrative agencies. A statute or ordinance which in effect reposes an absolute, unregulated, and undefined discretion in an administrative agency bestows arbitrary powers and is an unlawful delegation of legislative powers. The presumption that an officer will not act arbitrarily but will exercise sound judgment and good faith cannot sustain a delegation of unregulated discretion. The legislature cannot vest in an administrative agency the power, in its absolute or unguided discretion, to apply or withhold the application of the law or to say to whom a law shall or shall not be applicable." 1 Am. Jur. 2d, Administrative Law, § 108, p. 907. "In order to avoid an unlawful delegation of power, the legislative authority must declare the policy or purpose of the law and, as a general rule, must also fix the legal principles which are to control in given cases by setting up standards or guides to indicate the extent, and prescribe the limits, of the discretion which may be exercised under the statute or ordinance by the administrative agency." 1 Am. Jur. 2d, Administrative Law, § 113, p. 913. "The standard or limit governing the authority and discretion of the agency in effecting the policy of the legislature must be found in the law itself, since only the legislature can create such standards and limits." 1 Am. Jur. 2d, Administrative Law, § 116, p. 919. "The personal judgment of the agency, where unrestrained, is not a standard or a sufficient standard, and even where broad standards are laid down it has been held that such standards are not sufficient if the statute or ordinance expressly adds '*in the opinion*' *of the agency,* or expressly confers policy-making power upon the agency." (Emphasis supplied.) 1 Am. Jur. 2d, Administrative Law, § 122, p. 929.

Law fails to meet requirements of due process clause if it is so vague and standardless that it leaves public uncertain as to conduct it prohibits or leaves judges and

jurors free to decide, without any legally fixed standards, what is prohibited and what is not in each particular case. Giaccio v. Pennsylvania, 382 U. S. 399, 86 S. Ct. 518, 15 L. Ed. 2d 447 (1966). See, also, State v. Cota, 99 Ariz. 233, 408 P. 2d 23; People v. Grubb, 63 Cal. 2d 614, 47 Cal. Rptr. 772, 408 P. 2d 100.

The present statute authorizes the board of examiners to order sterilization as a condition to the release of the patient when required or proper "in the opinion of the board of examiners." As noted above, the personal judgment of the executive agency where unrestrained, as in the present instance, does not comprise a sufficient standard. See, Abelson's, Inc. v. New Jersey State Board of Optometrists, 5 N. J. 412, 75 A. 2d 867, 22 A. L. R. 2d 929; Thompson v. Smith, 155 Va. 367, 154 S. E. 579, 71 A. L. R. 604; State ex rel. Makris v. Superior Court, 113 Wash. 296, 193 P. 845, 12 A. L. R. 1428. In the present case, the standard set by the Legislature as the basis for sterilization of an inmate of the Beatrice State Home is so general in nature that there is no way to determine in what particular situation or under what set of facts the Legislature intended to authorize sterilization. In substance, the act simply leaves it up to the board of examiners to determine in any given case whether the act should or should not be enforced and no rules whatsoever are laid down as a guideline for such determination. It is obvious that the board may arbitrarily, depending upon the particular thinking or philosophy of its individual members, exercise such authority as to one inmate and not as to another. The act may not be uniformly applied because as membership on the board of examiners changes through the years and new individuals with varying philosophies become members thereof, the circumstances under which the act is enforced may well vary with the change in thinking occurring with the change in membership. The fact that provision is made for an appeal to the district court does not remedy this situation as judges also change and one

judge may interpret the statute one way and another in a different manner.

"An unconstitutional delegation of power is not brought within the limits of permissible delegation by the establishment of procedural safeguards, *the right to judicial review,* or by the assumption that the officer acts and will act for the public good." (Emphasis supplied.) 1 Am. Jur. 2d, Administrative Law, § 101, p. 898. "Apart from certain exceptions, it is almost universally held that arbitrary powers may not be conferred on administrative agencies, *even though the courts are authorized to review the exercise of such power."* (Emphasis supplied.) 1 Am. Jur. 2d, Administrative Law, § 108, p. 907.

The broad powers conferred by the present act upon the board of examiners due to the lack of incorporation of adequate standards in the act are beyond the power of the Legislature to confer. In Golden v. Bartholomew, *supra,* this court stated: " 'Due process of law, as a limitation upon the police power, requires that it be exercised in such a manner that it is not arbitrary and unreasonable.' " In McGraw Electric Co. v. Lewis & Smith Drug Co., Inc., 159 Neb. 703, 68 N. W. 2d 608, it was said: "The Legislature may not constitutionally, under the guise of public interest, grant power without control or check, which may be exercised at will, with or without reason, arbitrarily or capriciously." The same general theme was followed in the case of Lincoln Dairy Co. v. Finigan, *supra,* wherein the court stated: "The limitations of the power granted and the standards by which the granted powers are to be administered must, however, be clearly and definitely stated in the authorizing act." Finally, in the case of State ex rel. Woolridge v. Morehead, 100 Neb. 864, 161 N. W. 569, L. R. A. 1917D 310, the following language may be found: "Police regulations with no other guide than the uncontrolled discretion of a board are discriminatory, and when so applied

that all persons may not engage in legitimate callings upon equal terms, are void."

In Bulova Watch Co., Inc. v. Robinson Wholesale Co., 252 Iowa 740, 108 N. W. 2d 365, it is stated: "A purely fact-finding authority may be vested in a nonlegislative body, but a discretionary power involving matters of policy is legislative in nature and may not be delegated." In O'Brien v. State Highway Commissioner, 375 Mich. 545, 134 N. W. 2d 700, it is stated: "Provisions of statute conferring upon a highway commissioner having jurisdiction of a highway power to approve or remove unauthorized roadside signs and advertising devices at will without having declared them a nuisance and without prescribing reasonably precise standards for guidance are constitutionally invalid." In Lewis v. Florida State Board of Health (Fla.), 143 So. 2d 867, it was said: "Legislature may not delegate power to enact law, to declare what law shall be, or to exercise unrestricted discretion in applying the law." That Nebraska subscribes to the principles set forth in the foregoing cases is apparent. The following language may be found in De Jonge v. School Dist. of Bloomington, 179 Neb. 539, 139 N. W. 2d 296: "The fixing of boundaries of school districts is exclusively a legislative function, but it may properly be delegated provided the Legislature prescribes the manner and the standards under which the power may be exercised." In Lennox v. Housing Authority of City of Omaha, 137 Neb. 582, 290 N. W. 451, it was stated: "The legislature cannot delegate its powers to make a law, but it can make a law to become operative on the happening of a certain contingency or on an ascertainment of a fact upon which the law intends to make its own action depend."

The following language may be found in Smithberger v. Banning, 129 Neb. 651, 262 N. W. 492, 100 A. L. R. 686: " 'Plaintiff earnestly contends that the above sections of the statute are void because they vest in an administrative board absolute, unregulated, and undefined discre-

tion to grant or withhold its certificate of approval under general statutory language, which fixes no standards or tests to which an applicant may knowingly conform, and from which it can be determined whether corporations, transacting precisely the same kind and character of business, have been or may be dealt with equally; that the statute attempts to vest in an administrative board absolute and arbitrary power to say which, if any, of two or more companies, proposing to transact the same kind of business in the same manner and under like conditions, may be permitted so to do in the state of Nebraska.

" 'If the statutes, when properly construed, grant or attempt to grant to an administrative board such unrestricted and arbitrary discretion as plaintiff contends they do, then we will be compelled to hold that they are void because violative of both state and federal constitutional provisions. They would deny the equal protection of the law and violate the due process provisions of the Fourteenth Amendment to the federal Constitution. * * *'

"Clearly, in the case at bar, the purposes, for which the fund of $4,000,000 was to be expended, were to be determined by the state assistance committee and the board of educational lands and funds. * * *

"In the Nebraska acts, there are no limitations, standards, rules of guidance or criterion for the guidance of the state assistance committee and the board of educational lands and funds in allocating funds for old age assistance, unemployment relief, mothers' health, unemployment insurance, and other forms of relief therein enumerated. There is no requirement that the administrators of the acts find certain facts in determining for which of the various purposes allocations should be made and no basis for determining the amount to be allocated to each or any of the purposes therein set forth. This is all left to the discretion of the state assistance committee. Under the authorities hereinbefore cited, this con-

stitutes a delegation of legislative functions to an administrative board."

In School District No. 39 v. Decker, 159 Neb. 693, 68 N. W. 2d 354, may be found the following: " 'It is a fundamental principle of our system of government that the rights of men are to be determined by the law itself, and not by the let or leave of administrative officers or bureaus. This principle ought not to be surrendered for convenience, or in effect nullified for the sake of expediency. However, it is impossible for the legislature to deal directly with the host of details in the complex conditions on which it legislates, and when the legislature states the purpose of the law and sets up standards to guide the agency which is to administer it, there is no constitutional objection to vesting discretion as to its execution in the administrators. * * * A statute which in effect reposes an absolute, unregulated, and undefined discretion in an administrative body bestows arbitrary powers and is an unlawful delegation of legislative powers. The presumption that an officer will not act arbitrarily but will exercise sound judgment and good faith cannot sustain a delegation of unregulated discretion.' * * *

" '* * * the method and manner of enforcing a law must of necessity be left to the reasonable discretion of administrative officers, but an act of the Legislature which vests in such officers the discretion to determine what the law is, or to apply it to one and refuse its application to another in like circumstances, is void as an unwarranted delegation of legislative authority.' "

As heretofore pointed out, the policy of the Legislature has not been made clear in the act in question. It appears that it is left for the board of examiners to adopt some kind of policy for the administration of this act. In other words, the board must decide as a matter of policy in what particular type of cases the act shall or shall not be applied. In so doing, it is acting in a legislative capacity not as a mere fact-finding board and it

again becomes apparent that the Legislature has failed to set out adequate standards for the administration of the act.

It is contended that a constitutional statute along the lines mentioned cannot be adopted. This is not correct. Indeed, it would appear that if some of the major findings found by the board of examiners in this case were to be incorporated in the act as standards for guidance of the board, a different picture would be presented.

The act in question is unconstitutional and the judgment of the district court should be affirmed.

BOSLAUGH, J., dissenting.

I dissent for the reasons stated in the opinion of Judge Newton. The costs of the proceeding, including the fees of the guardian ad litem, should be taxed to the appellant.