Otis **KETTELL**, Plaintiff,

v.

**JOHNSON & JOHNSON**, Defendant.

No. LR–71–C–12.

United States District Court,
E. D. Arkansas, W. D.

Feb. 22, 1972.

John T. Lavey, Little Rock, Ark., for plaintiff.

Charles K. Howard, Constangy & Prowell, Atlanta, Ga., William S. Miller, Jr., Little Rock, Ark., for defendant.

## MEMORANDUM OPINION

EISELE, District Judge.

This case is properly brought under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. The plaintiff, Otis Kettell, seeks reinstatement and back pay from his former employer, Johnson & Johnson. He alleges religious discrimination.

This opinion constitutes this Court's findings of fact and conclusions of law.

Otis Kettell is a resident of the State of Arkansas. Johnson & Johnson is a New Jersey corporation, with its main office and principal place of business located in New Jersey. The defendant does business in the State of Arkansas as the Chicopee Manufacturing Company, which operates a plant located in North Little Rock, Arkansas, where it is engaged in the manufacture and sale of non-woven fabrics. This is the only plant involved in this lawsuit.

The plaintiff worked for Chicopee for over ten years. He was hired by that company on December 28, 1959, as a slitter operator trainee and was promoted to slitter operator on February 8, 1960.

On June 26, 1963, he was promoted to chemical building operator trainee and on August 21, 1963, had progressed to chemical building operator. On October 16, 1967, Kettell was promoted to B Mechanic trainee in the powerhouse and on October 16, 1968, was designated B Mechanic (pipefitter) and he remained at that position until March 2, 1970, the date that his employment was terminated.

Kettell's religious preference is the Radio Church of God, which prescribes sundown Friday to sundown Saturday as the Sabbath. That religion imposes upon individuals the moral obligation to abstain from servile work during the period of the Sabbath. The record is not clear as to when plaintiff adopted the Radio Church of God as his religious preference but it appears to have been sometime during 1967 or 1968. His convictions about Sabbath work appear to have become more and more rigid as he studied more deeply the tenets of his religion. The evidence indicates that he first became troubled with the fact that he was working on Saturdays sometime during the fall of 1969. The last Saturday that he worked for Chicopee was October 18, 1969. This was a slow season for Chicopee and on those few Saturdays between October 18 and the first of the year when Kettell would have normally worked, he was able either to be relieved of his duties or to arrange to have a co-employee replace him. However, on January 1, 1970, Kettell made a New Year's resolution that he would no longer work during the Sabbath, as recognized by his religion, and he honored that resolution until the time of his termination.

Due to the nature of the B Mechanics' work, it was usually necessary that some of them work on Saturday and many times on Sunday. If the production workers worked five days, Monday through Friday, the B Mechanics worked on Saturday; if production worked Monday through Saturday, then the B Mechanics worked on Sunday. Chicopee's business was seasonal; there-

fore, they employed as small a number of employees as possible so that they would not have to lay off any employees during the slack seasons. This policy meant that during the busy season, all employees were required to work a great deal of overtime to fill all of the orders. It was undisputed that the business of the defendant required that plaintiff work overtime hours.

The personnel manager of Chicopee proposed to plaintiff's fellow employees and his supervisor that if they would work harder and "cover" for Mr. Kettell on Saturdays it might be possible to accommodate him. This proposal was not favored by the supervisor and, although the evidence was not clear, it appears that at least one B Mechanic also thought that the proposal would not work. (There were three B Mechanics, including the plaintiff.) In addition to that proposal, plaintiff was proffered the alternative of working on Saturday only when it was necessary that *all* B Mechanics be present. Frequently, only one or two B Mechanics were required. This suggestion was rejected by the plaintiff since it did require some Saturday work.

Since plaintiff was only prohibited by his faith from working sundown Friday to sundown Saturday, he proposed that he be allowed to work after sundown on Saturday or on Sunday at the normal Saturday wage rate. This proposal was rejected by the defendant as being unreasonable and burdensome since an A Mechanic was required to supervise a B Mechanic in many of the B Mechanic's duties.

The defendant's final reaction to the overall "negotiations" was colored with emotion. Those involved on its behalf felt they had gone far out of their way to help the plaintiff. They seem to interpret his adamant position as a challenge to the employer-employee relation itself and responded accordingly. This is understandable since persons with strong religious convictions can often seem very unreasonable and inflexible to those who do not share such beliefs. The result: plaintiff was fired.

Title 42 U.S.C. Section 2000e–2(a) (1) provides:

"(a) It shall be an unlawful employment practice for an employer:

"(1) To fail or refuse to hire or discharge any individual, or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; . . ."

Section 1605.1(b) of the rules of the Equal Employment Opportunity Commission sets forth its guidelines concerning a claim of religious discrimination:

"(b) The Commission believes that the duty not to discriminate on religious grounds, required by Section 703(a) (1) of the Civil Rights Act of 1964, includes an obligation on the part of the employer to make reasonable accommodation to the religious needs of employees and prospective employees where such accommodation can be made without undue hardship on the conduct of the employer's business. Such undue hardship, for example, may exist where the employee's needed work cannot be performed by another employee of substantially similar qualifications during the period of absence of the Sabbath observer."

Plaintiff argues that the EEOC regulation must be given great weight in defining and interpreting "discrimination" and that under their regulations failure to reasonably accommodate, unless the accommodation imposes an undue hardship on the employer's business, amounts to discrimination. See Jackson v. Veri Fresh Poultry, Inc., 304 F.Supp. 1276 (D.C.1969).

The defendant argues that there is no duty to accommodate. See Dewey v. Reynolds Metals Co., 429 F.2d 324 (6th Cir. 1970).[1] Defendant further argues that even if there were a duty to accommodate, reasonable steps were taken to

---

1. Affirmed at 402 U.S. 689, 91 S.Ct. 2186, 29 L.Ed.2d 267 by an equally divided court, Mr. Justice Harlan not participating.

make such an accommodation and that he was terminated only because further steps would have caused an undue hardship on its conduct of its business.

The Court finds that Mr. Kettell was a competent, hard-working employee and that he was sincere in his beliefs and would not in fact compromise those beliefs by working on Saturdays. It is further found that the defendant did make some effort to accommodate to the plaintiff's religious convictions. This Court cannot say, however, upon the basis of the evidence, that a workable accommodation to the plaintiff's beliefs could not have been accomplished without "undue hardship" on the part of the defendant. Certainly the necessary accommodation would have been at the considerable inconvenience of the defendant and, probably, its other employees. But inconvenience is not "undue hardship". So, assuming that the EEOC regulation sets forth the proper test to be applied, the Court would conclude that the defendant failed to meet it here. That, however, is not the proper test.

■ The failure to affirmatively accommodate an employee to the extent suggested by EEOC regulation cannot be equated with "discrimination". The EEOC regulation imposing a duty to so accommodate unless there is an undue hardship on the employer goes beyond the Congressional mandate as set forth in Title 42, Section 2000e–2(a) (1). If such an affirmative duty were intended to be imposed, Congress could easily have so provided. But to say that the failure to take affirmative steps which admittedly cause "hardship" to the employer constitutes "discrimination" is to do violence to the meaning and use of our language. To add the adjective "undue" confuses the issue but still places the burden upon the employer to inflict upon itself some hardship—regardless of the degree—to avoid the charge of discrimination.

■ Where administrative regulations go beyond any legitimate interpretation of a statute they must fall so that the true Congressional intent may be vindicated. Neither the courts nor administrative agencies are free to substitute their own standards—even though they deem them superior—for the standard imposed by the legislative act. See Dewey v. Reynolds Metals Co., supra. This is not to say that the Act, and particularly the word "discriminate", cannot be interpreted to require some degree of affirmative accommodation. Under the proper circumstances, failure to reasonably accommodate may indeed be strong evidence of discrimination.

■ Under the facts and circumstances of this case, reasonable efforts were made to accommodate to plaintiff's religious beliefs. The failure to take further affirmative action cannot be said to constitute discrimination.

It is therefore concluded that the plaintiff was not discharged because of his religion and, further, that the defendant did not discriminate against plaintiff because of his religion. In accordance with this memorandum opinion, an order will be entered this date granting judgment in favor of the defendant and dismissing the complaint.