WEST HELENA SAVINGS & LOAN ASSOCIATION, Plaintiff,

v.

FEDERAL HOME LOAN BANK BOARD and Federal Savings and Loan Insurance Company, Defendants.

WOODRUFF COUNTY SAVINGS AND LOAN ASSOCIATION, Plaintiff,

v.

FEDERAL HOME LOAN BANK BOARD and Federal Savings and Loan Insurance Corporation, Defendants.

Nos. H 74 C–19 and H 75 C–29.

United States District Court, E. D. Arkansas, E. D.

June 28, 1976.

Smith, Williams, Friday, Eldredge & Clark by Hermann Ivester, Little Rock, Ark., for both plaintiffs.

Eugene Schieffler, West Helena, Ark., for West Helena Assn.

Joe N. Peacock, McCrory, Ark., for Woodruff County Assn.

Lynne Finney, Washington, D. C., for amicus assn. state supervisors.

Harold E. Anderson, Jr., Little Rock, for Ark. state bd.

Roland Marcotte, Jr., Washington, D. C., for FHLBB and FSLIC.

## MEMORANDUM OPINION

OREN HARRIS, Senior District Judge.

In this proceeding, the plaintiff, West Helena Savings & Loan Association (WHSLA), filed petition for judicial review of the decision of the defendants, Federal Home Loan Bank Board and Federal Savings and Loan Insurance Corporation, denying the plaintiff's applications for insurance of accounts by the Federal Savings and Loan Insurance Corporation (FSLIC) pursuant to Title 12, U.S.C. § 1726 and membership in the Federal Home Loan Bank of Little Rock (FHLB–LR) pursuant to Title 12, U.S.C. § 1424 with Federal Home Loan Bank Board (FHLBB) as supervisory agent. Plaintiff also seeks declaratory judgment and mandamus as relief against the defendants.

The plaintiff, West Helena Savings & Loan Association, WHSLA, is a savings and loan association organized under the laws of the State of Arkansas and at all relevant times had neither received savings deposits nor made home loans.

On October 31, 1973, plaintiff (WHSLA) received a notice that FHLBB had disap-proved the petition. On March 11, 1974, FHLBB advised the plaintiff that the applications had been reconsidered and again denied.

In both instances, the basis for the action by the FHLBB was that there was "NO PUBLIC NEED" for an additional insured institution in the area proposed to be served by plaintiff.

On June 25, 1974, plaintiff, Woodruff County Savings and Loan Association (WCSLA), filed applications for insurance of accounts by the Federal Savings and Loan Insurance Corporation (FSLIC) under Title 12, U.S.C. § 1726, and membership in the Federal Home Loan Bank of Little Rock (FHLB–LR) under Title 12, U.S.C., § 1424 with FHLBB as supervisory agent.

Plaintiff, WCSLA, is a savings and loan association organized under the laws of the State of Arkansas, which at all relevant times had neither received savings deposits nor made home loans.

On December 31, 1974, plaintiff WCSLA received a notice that FHLBB had disapproved the applications. On July 1, 1975, the plaintiff received notice that, on reconsideration, FHLBB again denied the applications.

In both instances the basis for the action by FHLBB in denying the application was that there was "NO PUBLIC NEED" for an additional insured institution in the area proposed to be served by plaintiff, WCSLA.

Defendants are agencies of the United States Government responsible for the insurance of accounts of savings and loan associations in accordance with the provisions of Title IV of the National Housing Act (Act), 12 U.S.C. §§ 1724–1730.

In addition to its petition for judicial review, plaintiff, WCSLA, seeks declaratory judgment and mandamus as further relief.

As the two cases developed on motions for partial summary judgment filed in both cases, it became evident that the sole issue is whether the Federal Savings and Loan Insurance Corporation has statutory authority to deny applications for insurance of savings accounts from newly-chartered

state savings and loan associations on the basis of lack of "Public Need" for another insured institution in the community proposed to be served.

Counsel for the parties in both actions agree and have stipulated that this is a question of first impression, whereupon the Court concluded that the two cases should be consolidated and considered together on the issue.

In both cases, counsel for the parties have filed extensive pre-trial briefs and briefs on motions for partial summary judgment. In view of the nature of the issue presented in the case, the Court permitted the National Association of State Savings & Loan Supervisors to intervene as amicus curiae and file its brief in the Woodruff County Savings and Loan Association case. In view of the consolidation of the two cases, the brief is considered as applicable to both cases.

On July 28, 1975, counsel for the parties, by stipulation, entered numerous exhibits and designation of each exhibit included in briefs in the West Helena Savings and Loan Association case. Similar information is provided for the Woodruff County case.

On March 30, 1976, the Court scheduled a hearing, by request, on the motions for partial summary judgment. The parties in both cases appeared by counsel with Woodruff County and West Helena Savings and Loan Associations being represented by Honorable Hermann Ivester of Smith, Williams, Friday, Eldredge & Clark. Honorable Eugene L. Schieffler also appeared for West Helena Savings & Loan Association and Honorable Joe Peacock appeared for Woodruff County Savings & Loan Association. The defendants were represented by Honorable Roland L. Marcotte, Jr. Honorable Lynne Finney appeared representing, amicus curiae, National Association of State Savings & Loan Supervisors. Honorable Harold E. Anderson, Jr. appeared as counsel for Arkansas Savings and Loan Board and Arkansas Savings and Loan Supervisor. The Court heard argument from counsel appearing and accepted the case as submitted. Counsel for the parties were directed to file proposed findings and conclusions as to their respective contention from the record in the case.

The plaintiff associations contend that FSLIC has neither expressed nor implied authority to consider lack of "PUBLIC NEED" under the statute as a factor in connection with the approval or denial of applications for insurance of savings accounts from newly-chartered savings and loan associations. The FSLIC contends that it has implicit statutory authority to apply the "PUBLIC NEED" criteria.

The National Association of State Savings and Loan Supervisors (NASSLS) and the Arkansas Savings and Loan Association Board and State Supervisor support the plaintiffs' contention.

The jurisdiction of the Court is established pursuant to the Administrative Procedure Act, 5 U.S.C. §§ 701 et seq.; the Declaratory Judgment Act, 28 U.S.C. §§ 2201 et seq.; 28 U.S.C. § 1331(a); 28 U.S.C. § 1337; 28 U.S.C. § 1361 and 12 U.S.C. § 1730(k)(1).

The FSLIC is the agency charged with the task of insuring the accounts of (1) all federal savings and loan associations and (2) eligible state-chartered savings and loan associations which apply for insurance pursuant to Title IV of the National Housing Act of 1934, 12 U.S.C. §§ 1724 et seq. The FSLIC is a separate entity from the Board, but operates under the direction of the Board, 12 U.S.C. § 1725(a).

On August 22, 1972, the Arkansas Savings and Loan Association Board, in accordance with Ark.Stat.Anno. § 67–1824 (Repl. 1966), approved the application of West Helena Savings & Loan Association of West Helena, Arkansas, for a charter to do business as a savings and loan association. As required by Ark.Stat.Anno. § 67–1831 (Repl.1966), West Helena thereafter applied for insurance of accounts by the FSLIC.

The Arkansas Savings and Loan Association Board approved the charter application of Woodruff County Savings & Loan Association of Augusta, Arkansas, by order dated March 7, 1974, pursuant to Ark.Stat. Anno. § 67–1824 (Supp.1975).

Both West Helena and Woodruff County filed timely petitions for review of the administrative actions and both included requests for declaratory and injunctive relief. Both plaintiffs asserted, among other things, that the defendants had no statutory authority to deny them insurance of accounts on the basis of lack of need and that, even if the defendants had such authority, the denials were arbitrary, capricious and characterized as an abuse of discretion. The latter issue in each case depends on an examination of the respective administrative records. The parties have agreed that granting the plaintiffs' motions for summary judgment will dispose of the cases. The issue of review of the administrative action to determine whether it was arbitrary, capricious, or characterized as an abuse of discretion or otherwise improper in either or both cases would be reached only if the Court's rulings on the motions for summary judgment were adverse to the plaintiffs.

The cases have been consolidated only for the purpose of deciding the common issue of statutory authority.

■ It is well established that courts and not administrative agencies are the final arbiters of agency authority, *CPC Int'l, Inc. v. Train*, 515 F.2d 1032 (8th Cir. 1975). As stated by the Supreme Court of the United States in *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 213, 96 S.Ct. 1375, 1391, 47 L.Ed. 2d 668, 44 L.W. 4451, 4460 (1976):

> The rulemaking power granted to an administrative agency charged with the administration of a federal statute is not the power to make law. Rather, it is " 'the power to adopt regulations to carry into effect the will of Congress as expressed by the statute.' " *Dixon v. United States*, 381 U.S. 68, 74 [85 S.Ct. 1301, 1305, 14 L.Ed.2d 223, 228] (1965), quoting *Manhattan General Equipment Co. v. Commissioner*, 297 U.S. 129, 134 [56 S.Ct. 397, 399, 80 L.Ed. 528, 531] (1936). Thus, despite the broad view of the Rule advanced by the [SEC] in this case, its scope cannot exceed the power granted the [SEC] by Congress under § 10(b).

As stated by this Court, Eisele, J., in nullifying a regulation of the Equal Employment Opportunity Commission, "[w]here administrative regulations go beyond any legitimate interpretation of a statute they must fall so that the true Congressional intent may be vindicated. Neither the courts nor administrative agencies are free to substitute their own standards—even though they deem them superior—for the standard imposed by the legislative act," *Kettell v. Johnson & Johnson*, 337 F.Supp. 892, 895 (E.D.Ark.1972).

The question presented by these cases is whether the FSLIC has the authority to deny insurance of accounts to a state-chartered savings and loan association on the ground that, in the opinion of the FSLIC, no need exists for an additional insured association in the proposed service area. The Court concludes, on the basis of the statutory scheme and legislative history of the statutes governing the defendants' authority, that need for an additional insured institution is not one of the considerations authorized by Congress to be used in denying insurance of accounts.

The statute which defines the FSLIC's duty with respect to applications for insurance is 12 U.S.C. § 1726(c), which provides in pertinent part:

> The Corporation *shall* reject the application of any applicant if it finds that the capital of the applicant is impaired or that its financial policies or management are unsafe; and the Corporation *may* reject the application of any applicant if it finds that the character of the management of the applicant or its home financing policy is inconsistent with economical home financing or with the purposes of this subchapter. . . . In considering applications for such insurance the Corporation shall give full consideration to all factors in connection with the financial condition of applicants and insured institutions, and shall have power to make such adjustments in their financial statements as the Corporation finds to be necessary.

The statute does not mention "need for an additional insured institution" as a factor to be considered in granting or denying insurance of accounts. The statute expressly directs the FSLIC to reject an application for insurance if it finds (i) that the capital of the applicant is impaired or (ii) that its financial policies or management are unsafe. Congress permitted the FSLIC, in its discretion, to reject an application on the ground that (i) the character of the management of the applicant is inconsistent with the economical home financing or with the purposes of Title IV of the National Housing Act, or (ii) that the applicant's home financing policy is inconsistent with economical home financing or with the purposes of Title IV of the National Housing Act.

■ The defendants contend that, pursuant to 12 U.S.C. § 1726(a), the FSLIC has discretion to deny insurance to state-chartered institutions. That section provides:

It shall be the duty of the Corporation to insure the accounts of all Federal savings and loan associations, and it may insure the accounts of . . . savings and loan . . . associations . . . organized and operated according to the laws of the State . . . in which they are chartered or organized.

The defendants point out the distinction between the words "shall" and "may." They argue that since the FSLIC "shall" insure the accounts of Federal associations and "may" insure the accounts of state-chartered associations its approval of applications of state-chartered associations is discretionary.

This argument is not persuasive. It overlooks the following statutory provisions:

There is created a Federal Savings and Loan Insurance Corporation . . . which *shall* insure the accounts of institutions eligible for insurance as *hereinafter* provided . . . .. 12 U.S.C. § 1725(a) (emphasis added).

Application for such insurance *shall* be made immediately by each Federal savings and loan association, and *may* be made at any time by *other eligible* insti-

tutions. 12 U.S.C. § 1726(b) (emphasis added).

These provisions make insurance of accounts of eligible institutions mandatory. It is clear that "eligible" institutions which the FSLIC "shall" insure includes state-chartered institutions which meet the standards enumerated in subsequent statutory provisions.

There is no conflict between these provisions and the use of the words shall and may in 12 U.S.C. § 1726(a). Application for insurance by state-chartered institutions is permissive and, therefore, insurance of state-chartered institutions is permissive. Application for insurance by Federal associations in existence when the National Housing Act was enacted was mandatory and insurance was mandatory. The FSLIC "may" insure the accounts of state-chartered institutions, and it "shall" insure the accounts of those which apply for insurance and satisfy the criteria specifically provided by Congress. The defendants' claims of discretion do not find support in the statutory provisions.

■ Moreover, the interpretation advanced by the defendants renders meaningless that part of the statute which says that the FSLIC "may reject the application of any applicant if it finds that the character of the management of the applicant or its home financing policy is inconsistent with economical home financing or with the purposes of this subchapter." If the FSLIC could deny such applications on any ground which it deems to be related to the insurance risk, this grant of authority would be wholly swallowed up in the discretion claimed by the defendants. It is elementary that significance and effect must be given to every clause and part of a statute where possible, *In re Public Nat'l Bank*, 278 U.S. 101, 49 S.Ct. 43, 73 L.Ed. 202 (1928), *Brotherhood of Locomotive Firemen & Enginemen v. Northern Pac. Ry.*, 274 F.2d 641, 656 (8th Cir. 1960), *Burrow v. Finch*, 431 F.2d 486, 492 (8th Cir. 1970). Effect can be given to the statutory provision just quoted only by limiting the grounds upon which

the FSLIC may deny insurance to those contained therein. It is entirely consistent for Congress to declare that the FSLIC "may" approve such applications and follow this declaration with an enumeration of the specific grounds upon which the FSLIC "may" reject them.

■ The discretion claimed by the defendants also runs counter to the rule that specific statutory terms prevail over general terms. As stated in *Fourco Glass Co. v. Transmirra Products Corp.*, 353 U.S. 222, 228, 77 S.Ct. 787, 791, 1 L.Ed.2d 786, 790 (1957):

> However inclusive may be the general language of a statute, it "will not be held to apply to a matter specifically dealt with in another part of the same enactment. * * * Specific terms prevail over the general in the same or another statute which otherwise might be controlling."

The general language relied upon by the defendants, that the FSLIC "may insure the accounts" of state-chartered institutions, must yield to the specific language which provides that the FSLIC "may reject the application of any applicant if it finds that the character of the management of the applicant or its home financing policy is inconsistent with economical home financing or with the purposes of . . ." Title IV of the National Housing Act.

The words of Justice Holmes in *Gegiow v. Uhl*, 239 U.S. 3, 9, 36 S.Ct. 2, 3, 60 L.Ed. 114, 118 (1915) apply with equal force here:

> The statute, by enumerating the conditions upon which the allowance . . . may be denied, prohibits the denial in other cases.

■ The statute here, by enumerating the conditions upon which the FSLIC may deny insurance to state-chartered institutions, prohibits the denial of insurance on other grounds, *Atlantic Ins. Agency, Inc. v. Jordan*, 97 U.S.App.D.C. 184, 229 F.2d 758, 761 (1955).

It is interesting to note that the FSLIC does not claim that it has discretion to approve an application for insurance by an applicant which 12 U.S.C. § 1726(c) says it "shall reject." Yet the logic of its position requires this result also, for if the claimed discretion were conferred by 12 U.S.C. § 1726(a), then it "may" insure the accounts even of those institutions not meeting the mandatory statutory criteria. Obviously, the general language of 12 U.S.C. § 1726(a) is modified by the specific language of 12 U.S.C. § 1726(c).

The FSLIC is further directed by 12 U.S.C. § 1726(c) to "give full consideration to all factors *in connection* with the *financial condition* of applicants and insured institutions, and shall have power to make such adjustments in their financial statements as the Corporation finds to be necessary" (emphasis added). The considerations specified by Congress are directed to the financial condition of the applicant. The plain language precludes consideration of public need.

The defendants contend that this provision gives the FSLIC authority to reject insurance applications separate from the specifically enumerated standards. The fallacy in this position is that Congress plainly said that applications could be rejected on certain grounds and that, in considering applications, certain factors were to be considered. There is no indication that Congress intended to elevate the "factors to be considered" to "grounds to be acted upon." Clearly, Congress intended that the "factors" be considered in order to assist the FSLIC in arriving at its determination as to whether the grounds upon which the FSLIC might reject an application were or were not satisfied by an applicant.

Consideration of "all factors in connection with the financial condition of applicants and insured institutions" first assists the FSLIC in its task by allowing it to make informed adjustments to an applicant's financial statements so that the statements accurately reflect the applicant's assets and liabilities. This was a major consideration when the National Housing Act was adopted, as the depression had drastically affected the value of assets shown on associations' books. Second, con-

sideration of all such factors assists the FSLIC in its task by requiring it to compare the financial policies of an applicant to the financial policies of insured institutions and to evaluate the policies of each for the purpose of determining whether the applicant's financial policies are unsafe.

Similar comparisons of an applicant's management and home financing policy with those of insured institutions in the light of all factors affecting their respective financial conditions must be made to allow the FSLIC to determine whether the other statutory criteria are met. The factors to be considered are merely stepping stones, not ends in themselves. Yet, in both cases before the Court, the FSLIC relied upon mere factors and not on one of the permissible statutory grounds in denying the applications. This it cannot do.

The Court's conclusion is again buttressed by the fact that, under the defendants' interpretation of the sentence in question, the specifically enumerated criteria would be swallowed up in the more general and undefined language which would allow the FSLIC to use any factor it might choose as a ground for rejection of an application.

The defendants' expansion of the FSLIC's authority to include a consideration of need for an additional insured institution ignores the distinctions drawn by Congress between the chartering and insuring functions. In 1933, when Congress enacted the Home Owners' Loan Act, it specified that to obtain a Federal savings and loan association charter an applicant had to demonstrate a necessity and probability of success for the new association and that no undue harm would result to existing institutions, 12 U.S.C. § 1464(e).

The defendants admittedly have grafted these chartering criteria on to the National Housing Act as factors that an applicant for insurance must satisfy, claiming such was the intention of Congress. But 12 U.S.C. § 1726(b) makes it quite clear that Federal associations chartered prior to the adoption of the National Housing Act were required to apply for FSLIC insurance, exactly as state-chartered associations could

apply. It is illogical to suggest, as the position taken by the defendants does, that Congress intended to require any federal association chartered between June 13, 1933 (the effective date of the Home Owners' Loan Act) and June 17, 1934 (the effective date of the National Housing Act), to prove a second time that there was a need and probability of success for it and that it would cause no undue harm.

The distinction drawn by Congress between the chartering and insuring functions is evidenced by the fact that the FSLIC is a completely separate entity from the Board, 12 U.S.C. § 1437 and 12 U.S.C. § 1725(a). The provisions for Federal savings and loan associations and insurance of accounts for both Federal and state associations were part of an overall statutory scheme to alleviate the disastrous economic conditions of the 1930's.

The statutory scheme recognized the chartering functions of state officials acting pursuant to state laws. Decisions as to the need for state-chartered associations were left to state officials, and the Arkansas Savings and Loan Association Board determined that there was a need for each of the plaintiffs, Ark.Stat.Anno. § 67–1824. The function of the FSLIC is to insure the accounts of both Federal and state associations after such associations have been chartered by the appropriate authorities— Federal associations by the Board and state associations by state authorities.

The creation of the Board and the FSLIC were part of a unified legislative plan designed to provide financial stability in the savings and loan industry during the 1930's by encouraging an influx of funds for home mortgages, and at the same time insuring the safety of savings deposits on which the mortgages were based. At the time the two defendants were created, only state-chartered savings and loan associations existed in the United States. Congress authorized the Board to charter new Federal savings and loan associations, not to replace or necessarily to compete with state associations, but to fill a need in local areas where existing state savings and loan associations

could not be salvaged or where no savings and loan association existed at all. The 1938 annual report of the Board describes the origin of Federal savings and loan associations and the purpose of Congress in establishing them:

## ORIGIN OF FEDERAL SAVINGS AND LOAN ASSOCIATIONS

"Savings and loan associations have been operating in this country for more than 100 years under charters of the individual States and under various names such as building and loan associations, cooperative banks, and homestead associations. Federally-chartered institutions of this type are of comparatively recent origin. Their establishment came as a result of the depression which brought to light existing weaknesses in the structure of many financial institutions.

When Congress, in the special session of 1933, considered measures for the relief of home owners under threat of dispossession, it was confronted with the almost equally urgent problem of devising ways and means to revive thrift and home financing. Immediate relief for distressed home owners was provided by the refinancing operations of the Home Owners' Loan Corporation. However, to minimize the possibility of a recurrence of such a crisis, and to strengthen private home financing as an effective instrument of home ownership, assistance beyond temporary relief was imperative. Moreover, there were 1,555 counties in the United States—approximately one-half of the total number of counties—in which there were no local home-financing institutions whatever.

The necessity of dealing with these problems induced the Congress to embody in the Home Owners' Loan Act of 1933 provisions for the creation of Federal savings and loan associations as private institutions under Federal charter. The purpose of authorizing the establishment of these institutions was twofold: (1) To provide thrift where such facilities were unavailable or inadequate; and (2) to combine under Federal charter the best policies and practices developed in the

savings and loan industry during the 107 years of its experience. The organization, incorporation, and supervision of Federal savings and loan associations were vested in the Federal Home Loan Bank Board." (1938 Report of the Board, pp. 44–5)

Thus, the Board's own report evidences the intent of Congress to allow the creation of Federal savings and loan associations only where no viable state associations existed and not to replace state associations or erode the authority of state officials to create and regulate state associations, as the defendants are now attempting to do.

No court has yet considered the precise question before this Court. However, a similar case was presented to the highest court of the State of Nebraska in *State v. Morehead*, 100 Neb. 864, 161 N.W. 569 (1917). Although a decision of the Nebraska Supreme Court is not binding here, the Court is persuaded by the reasoning of that Court. In *Morehead* the petitioners applied to the state banking board for a charter authorizing them to open a new bank, such a charter carrying with it membership in the state guaranty fund. The petitioners had complied with all statutory requirements for obtaining a charter. However, as in our case, the banking board concluded that sufficient banking facilities existed in the area to be served (i. e., that there was no need), that a new bank would be detrimental to existing banks (i. e., that undue harm would result), and that an additional bank would "jeopardize the guaranty fund of the state and the public welfare." The banking board had no statutory authority to deny a charter for the reasons stated but denied the charter in spite of this fact. The Nebraska Supreme Court reversed the board's decision on the ground that the board had exceeded its legislative authority in denying a charter on a ground other than those authorized by statute. The Supreme Court ruled, 100 Neb. 864, 161 N.W. at 570:

If the Legislature had intended to confer upon the banking board the jurisdiction to determine how many banks there should be in any locality, or whether

there should not be any, it would have said so. To say that there is some sort of hidden intent in the language used which does not appear there would be, upon our part, an invasion of the power which is conferred upon the Legislature.

In response to the board's argument that allowing a new bank to open would have an adverse effect on the state guaranty fund, the Court stated, 100 Neb. 864, 161 N.W. at 571:

> It is strenuously argued that the guaranty fund is to be protected. That is undoubtedly right, but there is no provision that the banking board shall refuse to issue a charter to the proposed new bank simply because members of the board think that there are enough banks in the town or village. When the Legislature concludes, if it does that it will confer the power to limit the number of banks upon the banking board it may then have the right to do so, but at present there is no act which seems to confer this power.

The facts here warrant a similar conclusion. Although Congress directed the Board to consider the necessity for a new Federal savings and loan association before issuing a charter, Congress did not confer the power to limit the number of insured state savings and loan associations through the denial of insurance of accounts. Congress confined the FSLIC's authority to a determination of facts relating to the financial soundness of the institution applying for insurance. The Court cannot read an additional requirement for obtaining insurance into a statute which contains such specific requirements as the statute in question.

Congress established a dual system of Federally insured institutions by providing for the creation of Federal savings and loan associations and shortly thereafter providing for insurance of accounts of both Federal and state-chartered associations. Of necessity such a division entails a separation of the functions to be performed by Federal agencies on the one hand and state agencies on the other.

The function of granting charters and that of providing insurance of accounts are two entirely different functions. The Board, acting in its chartering capacity, must judge applications for Federal charters on the basis of necessity, probability of success and undue harm, 12 U.S.C. § 1464(e). State authorities apply similar statutory standards to applications for state charters. The Arkansas Savings and Loan Association Board found that the plaintiffs had satisfied identical criteria of need, probability of success, and undue harm, Ark.Stat.Anno. § 67–1824.

The Board, acting in its capacity as operating head of the FSLIC, must judge applications for insurance of accounts by the criteria provided in 12 U.S.C. § 1726. The standards of need, probability of success and undue harm are not found in that statute. Had the applications of both plaintiffs for insurance by the FSLIC been judged only according to the criteria enumerated in 12 U.S.C. § 1726(c) there would have been a minimal overlapping of the Arkansas Board's function by the FSLIC. But, in accordance with its interpretation of its authority, the FSLIC performed almost exactly the same function as the Arkansas Board, determining for itself whether the plaintiffs met the standards of need, probability of success, and undue harm.

The FSLIC has misapplied the standards imposed by the chartering statute to applications for insurance of accounts. In doing so, it moved into an area clearly reserved for the states by Congress. The Arkansas law and laws of other states providing for state charters would be superfluous if the FSLIC's position were correct. Yet, state laws establishing state savings and loan associations were clearly sanctioned by Congress when it delineated the functions to be played by the Federal agencies. It has long been held that in ascertaining the scope of federal legislation due regard for the proper adjustment of local and national interests under our federal system must be taken into account, *Stefanelli v. Minard,* 342 U.S. 117, 72 S.Ct. 118, 96 L.Ed. 138 (1951).

In *Palmer v. Massachusetts,* 308 U.S. 79, 83, 60 S.Ct. 34, 36, 84 L.Ed. 93, 97 (1939) the Court made the following statement which is directly applicable here:

> And so we have one of those problems in the reading of a statute wherein meaning is sought to be derived not from specific language but by fashioning a mosaic of significance out of the innuendoes of disjointed bits of a statute. At best this is a subtle business, calling for great wariness lest what professes to be mere rendering becomes creation and attempted interpretation of legislation becomes legislation itself. Especially is wariness enjoined when the problem of construction implicates one of the recurring phases of our federalism and involves striking a balance between national and state authority in one of the most sensitive areas of government.

The plaintiffs here simply point to the explicit language of the statute in question. The defendants strive to bring within its terms by implication part of an entirely different statute, the result of which would be absorption of state authority by a Federal agency. The Court in the above case continued, 308 U.S. at 84, 60 S.Ct. at 36, 84 L.Ed. at 97:

> To be sure, in recent years Congress has from time to time exercised authority over purely intrastate activities . . . But such absorption of state authority is a delicate exercise of legislative policy in achieving a wise accommodation between the needs of central control and the lively maintenance of local institutions. Therefore, in construing legislation this court *has disfavored in-roads by implication on state authority* and resolutely confined restrictions upon the traditional power of states . . . . (emphasis added).

■ Implied inroads in state authority such as those made by the defendants are not to be favored.

Similar views were expressed in *Federal Trade Comm'n v. Bunte Bros.,* 312 U.S. 349, 351, 61 S.Ct. 580, 582, 85 L.Ed. 881, 883 (1941):

[B]earing in mind that in ascertaining the scope of congressional legislation a due regard for a proper adjustment of the local and national interest in our federal scheme must always be in the background, we ought not to find in § 5 radiations beyond the obvious meaning of language unless otherwise the purpose of the Act would be defeated.

Likewise, such radiations beyond the obvious meaning of the statutory language that the defendants have found in the National Housing Act must be rejected, for not only will such a holding *not* defeat the purposes of the National Housing Act, it will actually *promote them* as pointed out below. See also *A. B. Kirschbaum Co. v. Walling,* 316 U.S. 517, 62 S.Ct. 1116, 86 L.Ed. 1638 (1942).

This principle is supported in *United States v. Bass,* 404 U.S. 336, 349, 92 S.Ct. 515, 523, 30 L.Ed.2d 488:

". . . unless Congress conveys its purpose clearly, it will not be deemed to have significantly changed the federal-state balance." Citing *FTC v. Bunte,* supra.

The question is how far Congress intended to extend its mandate. The answer depends on the statutory language, read in light of its purposes and legislative history, *Gulf Oil Corp. v. Copp Paving Co.,* 419 U.S. 186, 95 S.Ct. 392, 42 L.Ed.2d 378. Citing *FTC v. Bunte,* supra, 312 U.S. at pp. 349, 351, 61 S.Ct. 580.

In a more recent case, the agency construed the phrase "in commerce" should be read as if it meant "affecting interstate commerce" which construction was emphatically rejected: "The construction of § 5 urged by the Commission would thus give a federal agency pervasive control over myriads of local businesses in matters heretofore traditionally left to local custom or local law. . . . An inroad upon local conditions and local standards of such far-reaching import as is involved here, ought to await a clearer mandate from Congress." *U. S. v. American Bldg. Maint. Industries,* 422 U.S. 271, 276, 277, 95 S.Ct. 2150, 2154, 45 L.Ed.2d

177; *FTC v. Bunte,* supra, 312 U.S. at 354–355, 61 S.Ct. 580.

The basic purpose of all savings and loan associations was (and is) as stated in 12 U.S.C. § 1464(a):

"[T]o provide local . . . thrift institutions in which people may invest their funds and . . . to provide for the financing of homes."

An inroad upon this basic purpose, as specifically provided by Congress, that would result in such far-reaching import as involved in these proceedings should await a clearer mandate from the Congress.

The contention of the defendants that the use, custom and practice in recent years should give weight to such contention is answered by Mr. Justice Frankfurter in *FTC v. Bunte,* supra, 312 U.S. p. 351, 61 S.Ct. p. 582, as follows:

"That for a quarter century the Commission has made no such claim is a powerful indication that effective enforcement of the Trade Commission Act is not dependent on control over intrastate transactions. Authority actually granted by Congress of course cannot evaporate through lack of administrative exercise. But just as established practice may shed light on the extent of power conveyed by general statutory language, so the want of assertion of power by those who presumably would be alert to exercise it, is equally significant in determining whether such power was actually conferred."

Citing *Norwegian Nitrogen Co. v. United States,* 288 U.S. 294, 315, 53 S.Ct. 350, 77 L.Ed. 796.

In *California State Bd. of Equalization v. Goggin,* 191 F.2d 726, 730 (9th Cir. 1951) and *California State Bd. of Equalization v. Goggin,* 245 F.2d 44, 47 (9th Cir. 1957), the Court said:

It would be unwise to foster conflict where Congress has manifested a desire for harmony. . . . Our conclusion . . . adheres . . . to the doctrine that where problems in the sphere of dual sovereignty are involved, legisla-

tion should receive a construction which permits both to function with a minimum of interference each with the other.

While it is true that the defendants' interpretation of the FSLIC's authority does not directly preclude the states from functioning in the area in question, it nonetheless results in maximum interference with their functioning by rendering many of their actions exercises in futility. Although, the state authorities can still charter savings and loan associations, in many instances those associations cannot compete with insured associations. In such instances state charters become meaningless. This is especially true with regard to states such as Arkansas where competition by non-FSLIC insured institutions is prohibited by state law, Ark.Stat.Anno. § 67–1831. At the present time, all savings and loan associations operating in Arkansas are insured by the FSLIC.[1]

The laws of Arkansas and of a number of other states are coordinated with and designed to promote the purposes of the National Housing Act to the maximum extent possible, with the requirement of FSLIC insurance being one of the means of accomplishing this result. Yet it is in states where such laws exist that the denial of FSLIC insurance on non-statutory grounds results in maximum interference with the operation of the state laws. Application of the criteria devised by Congress to insurance applications will reduce this interference to a minimum, in keeping with the above cases and in keeping with the balance between state and Federal authority as weighed by Congress.

The defendants cite several cases to support their position that the Board has broad discretion pursuant to its statutory authority, *Bridgeport Fed. Sav. & Loan Ass'n v. Federal Home Loan Bank Bd.,* 307 F.2d 580 (3rd Cir. 1962), *North Arlington Nat'l Bank v. Kearny Fed. Sav. & Loan Ass'n,* 187 F.2d 564 (3rd Cir. 1951), *California v. Coast Fed. Sav. & Loan Ass'n,* 98 F.Supp. 311 (S.D.Cal-

1. In addition to the plaintiffs three other associations chartered by the Arkansas Board have been denied FSLIC insurance since 1972 and thereby prevented from doing business.

if.1951). However, without exception, those cases deal with the discretion granted to the Board under the Home Owners' Loan Act rather than with discretion granted to the FSLIC. The discretion conferred by Congress on the Board is vastly greater than that conferred on the FSLIC, and logically so. The Board, as sole regulator and supervisor of Federal associations, has plenary power over such associations. The FSLIC, however, is only secondarily responsible for regulation and supervision of FSLIC insured state-chartered associations. It neither has nor needs the discretion conferred on the Board. The foremost example of this difference in discretion is contained in 12 U.S.C. § 1464(a) which provides:

> In order to provide local mutual thrift institutions in which people may invest their funds and in order to provide for the financing of homes, the Board is authorized, under such rules and regulations as it may prescribe, to provide for the organization, incorporation, examination, operation, and regulation of associations to be known as "Federal Savings and Loan Associations", and to issue charters therefor, *giving primary consideration to the best practices of local mutual thrift and home-financing institutions in the United States.* (emphasis added)

This broad discretion is limited to the Board when it is acting pursuant to the Home Owners' Loan Act. No such mandate was bestowed on the FSLIC. The different functions of the Board and the FSLIC are clearly defined by statute, but the defendants have obscured those differences by operating as if the discretion possessed by the Board was possessed in equal measure by the FSLIC.

It also appears that the defendants tend to favor Federal associations to the detriment of state-chartered associations. This favoritism was, in fact, one of the reasons cited in the Texas study for the creation of the state insurance program in North Caro-

lina. In 12 C.F.R. § 556.5(7)(b)(5), Board policy is stated to be:

> As a general policy, the Board encourages the establishment of branch offices and other office facilities by Federal associations in communities and market areas which either are not serviced or are underserviced by existing savings and loan facilities. . . . Since the Board's general policy is to encourage expansion through branching, protests to applications for office facilities will have to be increasingly persuasive and factually documented to adversely affect the Board's decisions on such applications.

■ The Board, acting as such, may well have the discretion to promote this policy of encouraging the establishment of office facilities of Federal associations, although it appears to have shifted the burden of proof from applicants to protestants. But the Board, acting as head of the FSLIC, has no discretion to encourage the establishment of Federal association offices by discouraging the establishment of state-chartered associations through denial of insurance.

This conflict between state and Federal associations is a factor in both cases before the Court. West Helena filed its application for a charter on June 16, 1971. Helena Federal Savings & Loan Association filed an application for a branch office in West Helena with the Board on June 2, 1971, apparently in an effort to head off the charter application. The branch application was approved on October 26, 1971, and is now operating, while West Helena's charter was not approved by the State Board until August 22, 1972.[2]

In January, 1976, Newport Federal Savings & Loan Association filed an application for a branch office in McCrory, the county seat of Woodruff County located approximately 10 miles from Augusta in Woodruff County's proposed service area. Approval of this branch office of a Federal association would, obviously, seriously hamper the

---

**2.** The City of Helena has a population of approximately 10,500 and the City of West Helena has a population of approximately 11,000.

The trade area of service in Phillips County consists of approximately 40,000 in population.

efforts of Woodruff Savings and Loan Association to become established.[3]

Both of these Federal associations have long been in existence. It is apparent that their applications for branch offices were influenced in part by the plaintiffs' efforts to serve their respective areas. Because of the significant adverse effects competition from these new branch offices of Federal associations would likely have on the plaintiffs' newly-chartered association, it is only reasonable that the plaintiffs should have a period of operation with FSLIC insurance without such competition from newly established Federal branch offices.

The conclusion of the Court that the criteria fixed by the Congress for obtaining insurance precludes rejection by the defendants of an application on the basis of need is supported by the legislative history of the National Housing Act and other enactments about the same time.

The legislative history leaves no room for doubt that Congress was primarily concerned with the financial solvency of the institutions to be insured by the FSLIC and that Congress believed it was setting definite standards for obtaining insurance which, if met, entitled an applicant to insurance. No statement in the legislative history discusses the criteria of need, success, or undue harm which have been added by the defendants, for the obvious reason that application of these criteria to applications for insurance was neither contemplated nor intended by Congress. The soundness of applicants for insurance was obviously to be measured by the specific criteria of the statute which does not include need.

Congress' concern for the financial condition of institutions to be insured by the FSLIC is consistent with the fact that at the time it considered the National Housing Act the only requirement a bank had to meet to obtain insurance by the Federal Deposit Insurance Corporation (the "FDIC") was solvency. This requirement was originally codified in 12 U.S.C. § 264(y) which provided:

> [A]ny State bank which is not a member of the Federal Reserve System, with the approval of the authority having supervision of such State bank and certification to the [FDIC] by such authority that such State bank is in solvent condition, shall, after examination by, and with the approval of, the [FDIC], be entitled to become a member of the Fund and to the privileges of this subsection upon agreeing to comply with the requirements thereof and upon paying to the [FDIC] an amount equal to the amount that would be required of it under this subsection if it were a member bank.

In debate on the 1935 amendment to this provision which resulted in the present 12 U.S.C. § 1816, one of the chief architects of the banking legislation of the 1930's, Representative Henry B. Steagall of Alabama, made the following statements:

> *Mr. Steagall*: State nonmember (i. e., of the federal reserve system) banks were to be insured upon application upon certification of solvency by the duly constituted State authorities and examination by the insurance corporation, showing to the satisfaction of the Board that such banks were in solvent condition. 79th Cong. Rec. 6578 (1935)

> *Mr. Steagall*: In the Act of 1933 the rule laid down as a test for membership in the [FDIC] by a non-member State bank was solvency, and under that all State banks except 1,100 joined the [FDIC]. Under the [proposed] law these requirements are tightened and solvency alone is not the test. . . . 79th Cong.Rec. 6581 (1935)

Solvency was thus the sole criterion for obtaining insurance by the FDIC at the time the National Housing Act was adopted. On August 23, 1935, Congress amended the Federal Deposit Insurance Corporation Act to adopt additional criteria which applicants for FDIC insurance were required to

---

**3.** McCrory is the county seat of Woodruff County and has a population of 1,378. Augusta, the site of the proposed Woodruff County Savings and Loan Association, has a population of approximately 2,777. The trade area is in excess of 12,000 in population.

meet. Specifically enumerated criteria include "future earnings prospects" and "the convenience and *needs* of the community to be served by the bank", but do not include the criterion of undue harm, 12 U.S.C. § 1816.

These statutory criteria are very similar to the requirements specified in 12 U.S.C. § 1464(e) for obtaining a Federal savings and loan association charter which were enacted on June 13, 1933. An applicant for a Federal charter must demonstrate that "a *necessity exists* for such an institution in the community to be served," that "there is a reasonable probability of its usefulness and success," and that it "can be established without undue injury to properly conducted existing local thrift and home-financing institutions." The FSLIC admittedly has borrowed these criteria for use in judging insurance applications, claiming that Congress included such criteria in the National Housing Act by implication.

But the National Housing Act and the criteria which govern insurance of accounts by the FSLIC were enacted midway between the dates of enactment of the other two statutes, on June 27, 1934. Congress obviously was capable of articulating the standards the defendants are attempting to read into the National Housing Act. The fact that Congress expressly included such standards in statutes enacted one year before and one year after the National Housing Act shows that Congress could readily have included such standards in 12 U.S.C. § 1726, had it intended to adopt those standards. Instead, Congress chose very different standards, which the defendants must follow.

The defendants assert that the FSLIC has, throughout its history, interpreted its statutory authority to allow it to reject applications for insurance on grounds other than the ones specified by Congress, that its interpretation has never been judicially challenged, and that, because of these facts, their interpretation is entitled to deference unless it is clearly erroneous. The defendants' present interpretation is clearly erroneous. (*FTC v. Bunte*, supra, 312 U.S. p. 351, 61 S.Ct. 580).

The position presently taken by the defendants appears, in fact, to be the result of a relatively recent reinterpretation of the FSLIC's statutory authority. The First Annual Report of the FSLIC, for the year ending June 30, 1935, included in the Third Annual Report of the Board, sets forth in detail the requirements for receiving insurance:

Reasonable standards of eligibility, applicable to all institutions seeking insurance whether under a State or Federal charter, were adopted in the fall of 1934. They provide that an applicant, to be approved for insurance, must have unimpaired capital, safe financing policies and management and its home-financing policies must be consistent with economical home-financing and the purposes of insurance. An applicant's affairs should also indicate the ability, within a reasonable time after being insured, to operate normally as regards withdrawal or repurchase requests and the payment of earned dividends sufficient to attract new accounts.

These standards of eligibility are indicative of the stability and soundness of the Insurance Corporation and have attracted many applications from eligible institutions whose affairs are above criticism. They are not, however, so severe as to limit unduly the number of institutions which can qualify on the basis of their present management and financial condition. (Third Annual Report of the Federal Home Loan Bank Board, pp. 74–75.)

The standards for eligibility originally adopted by the defendants are limited to factors relating to the financial soundness of the particular applicant and conform closely to the statutory standards created by Congress. No mention was made in the defendants' initial interpretation of their authority of need as a factor to be considered in granting applications for insurance.

The defendants' next report, for the year 1935–6, sets forth the eligibility require-

ments for insurance in even greater detail. Here again, it is clear that shortly after the FSLIC was created, the defendants' eligibility requirements did not include need. The factors then to be considered by the defendants in determining whether or not to grant insurance to state-chartered institutions were restricted to those involving the financial soundness of the particular institution, as directed by statute.

The membership requirements described in the 1955 report continued unchanged until 1958. In 1958, for the first time, the defendants added the criterion of "need for an additional insured facility" to the established statutory scheme. The new requirement included the following:

> In determining an applicant's eligibility for insurance of accounts, consideration is given to the need for an additional insured facility and a thorough examination is made of the applicant's assets, liabilities, financial policies, and operating procedures. After an analysis of all pertinent facts bearing upon the character of the institution and its management and directors, the Corporation determines whether the institution is insurable in its present condition, whether the institution could qualify for insurance by meeting certain conditions, or whether the application should be rejected. (emphasis added). (1958 Annual Report of the Board, pp. 39–40.)

By 1964, the defendants had elevated their "need" standard to a "basic requirement." Their report states:

> Forty-seven of [83 applications filed by State institutions for insurance] were approved conditional upon meeting certain requirements. In one case, the Board deferred action altogether pending corrective measures by the institution; and in 16 others, a formal hearing was scheduled before an officer of the Board. *The remaining 19 applications were rejected because of failure to meet one or more of the basic requirements—such as evidence of (1) a need for an additional insured facilities in the area; (2) the prospect for successful operation, without undue*

injury to other insured institutions; and (3) sound management, financial, and operating policies. (emphasis added). (Annual Report of the Board for 1964, p. 56.)

The defendants introduced as exhibits Board resolutions the defendants claim demonstrate their long standing interpretation. The date of the earliest resolution submitted showing a rejection of an application for insurance on the ground of need is April 26, 1955. One additional resolution showing rejection on this ground was dated in 1955, one in 1956, one in 1958, and one in 1961. These dates are consistent with the pattern shown in the annual reports. Together they show the defendants felt their way along to see what reaction their addition of non-statutory criteria would bring, first rejecting a few applications on the strength of the added criteria, then mentioning those criteria in their annual reports, and finally elevating the new criteria to the level of "basic requirements" in their annual reports.

The defendants' own statements in their annual reports demonstrate that they unilaterally added the "need" requirement to the statutory scheme established by Congress. Clearly no authority for such an addition exists.

■ The principle is well established that where an administrative interpretation of a statute has not been uniform it will be given weight only for cogent reasons, *United States v. Missouri Pac. Ry. Co.*, 278 U.S. 269, 280, 49 S.Ct. 133, 134, 73 L.Ed. 322, 378 (1928). The defendants' interpretation which is at issue here has not been uniform and, in fact, their initial interpretation is the very one advanced by the plaintiffs. There is no cogent reason for adopting the interpretation now advocated by the defendants.

It is undisputed that the significant omission rule as to the authority of the defendants is applicable and cannot be explained away. The Federal Home Loan Bank Board became aware of this rule in a Pennsylvania case, *Federal Home Loan Bank Bd. v. Greater Delaware Valley Federal Savings and Loan Association*, D.C., 176

F.Supp. 24 (1959). At page 27, the Court stated:

"Congress did not, in paragraph 2, make the conversion subject to such rules and regulations as the Board may prescribe. Instead, Congress spelled out the conditions which must be met for a paragraph 2 conversion from a Federal to a State charter. Nor did Congress expressly state that such paragraph 2 conversions shall be subject to approval of the Board, although it gave the Home Owners' Loan Corporation the power of approval if it owned shares of the association. Had Congress intended to give the Board the power of approval, it could have easily said so. It would not have left such an important matter to construction or inference. It gave it such power in a paragraph 3 conversion and also gave the Home Owners' Loan Corporation a power of approval of a paragraph 2 conversion where it held shares of the association. The omission to give the Board power of approval of a paragraph 2 conversion must, therefore, have been intentional. The doctrine of *expressio unius est exclusio alterius* compels the conclusion that Congress did not intend that the Board should have approval power in a paragraph 2 conversion." (Affirmed, Court of Appeals, 3rd Circuit, 277 F.2d 437, 1960).

The doctrine of *expressio unius est exclusio alterius* being applicable to the instant cases compels the conclusion that the Congress did not intend that the Board should consider public need as a determining factor on an application for FSLIC insurance.

It is clear that the defendants have exceeded their authority in rejecting the plaintiffs' applications for FSLIC insurance. It follows that the motion for summary judgment in each case should be granted and the defendants directed to grant both plaintiffs insurance of their accounts.

The Court incorporates findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure.

A judgment will be entered in accordance with this opinion.